**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| PENNY LEWIS, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 4:22-cv-00228-SEP |
| MHM HEALTH PROFESSIONALS, LLC, | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM AND ORDER**

Before the Court is Defendant's Motion for Partial Summary Judgment on Plaintiff's Kronos-Related Claims, Doc. [101]. For the reasons set forth below, the motion is denied.

**FACTS AND BACKGROUND[1]**

Plaintiff Penny Lewis brings this action on behalf of herself and other similarly situated employees, alleging that their employer MHM Health Professionals, LLC, paid them too little, too late following a ransomware attack on Kronos, its timekeeping and payroll processing software. *See* Doc. [106] ¶¶ 3-5. MHM Health Professionals, LLC, doing business as Centurion ("MHM" or "Centurion"), is a healthcare staffing company that services detention facilities. Doc. [102] ¶¶ 11-12, 106. MHM uses Kronos software for employee timekeeping and payroll processing. *Id.* ¶¶ 13, 16. In addition to recording time, Kronos software stores payment protocols to comply with regulatory requirements for healthcare workers in different states. *Id.* ¶¶ 19, 59. Kronos contains rules for rounding time worked, differential payments for nighttime and weekend work, lunch deductions, Arizona shift bonuses, variable rate employees' pay, coverage pay, holiday eligibility, weighted overtime, weighted double-time, and daily overtime for applicable employees. *Id.* An employee or manager inputs hours worked by an employee, and Kronos calculates his or her pay. *See id.* ¶¶ 17, 19, 79; Doc. [104] at 21 ("the Kronos outage disabled the calculation engine through which timekeeping data was run for payroll processing.").[2]

---

[1] Unless otherwise noted, the facts in this section are not disputed.

[2] Unless otherwise noted, page numbers for docket entries refer to the CM/ECF page number.

On or about Friday, December 10, 2021, Kronos suffered an external ransomware attack. Doc. [102] ¶ 24.[3]  Because of the attack, MHM employees were unable to access MHM's database in Kronos until January 19, 2022.  *Id.* ¶ 26.  During the relevant period, approximately 75% of MHM's non-exempt employees required one or more special payment calculation on a regular basis.  *Id.* ¶ 20.  As MHM states, "[w]ithout Kronos, there was no *automated* way to do these calculations."  *Id.* (emphasis added).  Because some work locations do not have time clocks, approximately 20% of MHM's employees enter time though Teletime, a phone-based punch recording method.  *Id*. ¶ 17.  When the Kronos database is unavailable, Teletime cannot record time punches.  *Id*. ¶ 18.  MHM's two-week payroll period runs from Sunday to the second Saturday of the two-week period.  *Id.* ¶ 21.  Employees are ordinarily paid on the Friday following the two-week period, but if pay day falls on a holiday, employees are paid on the day before.  *Id*.  During the outage period, MHM employed 5,859 non-exempt employees in the United States.  *Id.* ¶ 23.

At the time of the attack, Ashley Taylor worked as MHM's Director of Payroll Operations and Systems.  *Id.* ¶ 27.  Her department managed the payroll process, including configuring and reviewing the timekeeping system.  *Id.* ¶ 28.  Site-level managers handled data input of hours and attendance into the Kronos timekeeping system, and Taylor's department processed the hours data gathered into Kronos.  *Id*. ¶¶ 29-30.  During the outage, MHM reports that it employed seven employees to process payroll for the entire company.  *Id.* ¶ 31.

Kronos first notified MHM about the ransomware attack and the impact on MHM's production and backup databases on Sunday, December 12, 2021, at 8:51 a.m. EST.  *Id.* ¶ 33.  Kronos's cloud team communicated the following message to MHM:  "For additional assistance, please open a case in the UKG Kronos Community.  UKG Support Representatives are available to assist walking you through alternatives."  *Id.* ¶ 35.  MHM's internal Kronos Manager Hugo Vega Hernandez promptly opened a case and called Kronos Global Support "many times," but did not reach anyone available to help.  *Id.* ¶ 36.  Hernandez then reached out to Kristian Sevison, a Kronos senior sales executive, who told Hernandez late on December 12th that he was not sure what alternatives were available and that MHM should call Kronos Global Support on Monday morning when it is fully staffed.  *Id.* ¶¶ 36-37.  On Monday morning, Taylor reached

---

[3] UKG (also "Kronos") is a vendor external to MHM that manages the Kronos software.  *See, e.g.*, *id*. ¶¶ 6, 45.

out to Sevison over email stating, "I'm calling you now, we need an alternate plan." *Id.* ¶ 38. Sevison emailed back, in relevant part: "I was on a call and not able to answer. I am not sure what is being done from an alternative plan standpoint. It is best to follow-up on the ticket with Global Support . . . and see what the options are." *Id.* Taylor again reached out to Sevison to schedule a call, but Sevison told her that he did not know of any "alternative options at the moment" and recommended that she reach out to Global Support in the meantime. *Id.* ¶ 39. Taylor then asked Sevison if there was a "redundancy plan for clients on impacted solutions housed in Kronos Private Cloud for database copies that could be potentially stood up?" *Id.* ¶ 40. Sevison responded that "full and incremental backups are stored in a secondary datacenter, but all connections to that datacenter have been removed as well for security and data integrity purposes, so I do not see anything able to be stood up in the short term (this week at least)." *Id.* ¶ 41. Kronos recommended that MHM duplicate its last payroll as an interim solution. *Id.* ¶ 42; Doc. [102-19] at 16 (Q. Did someone say that to you directly, that other Kronos UKG clients were duplicating their last payroll? A. Yes. With Kronos, they said that some of their other clients were duplicating their payroll. The UKG rep basically said you're [sic] only—your best option is to duplicate your last payroll.").

MHM assembled a team and on December 16, 2021, announced in a written communication a "temporary approach" for reporting time ("December 16th Written Communication"). Doc. [102] ¶ 49. MHM's analytics team had created a "Centurion Hours Tracker" Excel spreadsheet to track all employee hours beginning December 5, 2021. *Id.* ¶ 49. The Centurion Hours Tracker replaced the regular Centurion timekeeping exception form, which was typically used for adjusting timecards (i.e., missed punches, jury duty, bereavement, etc.). *Id.* ¶ 50. Employees were instructed to punch in via the time clock and also to use the Centurion Hours Tracker to track hours and exceptions. *Id.* ¶ 51. In the Centurion Hours Tracker, employees "select[ed] the pay period and work location facility, enter[ed] all in and out punches, select[ed] whether a meal break was taken, enter[ed] any time off, review[ed] and sign[ed] the complete tracker, and submit[ted] it to their supervisor responsible for timecard approval and submission." *Id.* ¶ 52. The supervisors "were instructed to receive a completed tracker for each employee, for each pay period; review each tracker for completeness and accuracy; authorize each tracker with a signature; save each hours tracker with a unique name to avoid overwriting previous uploads; and upload each tracker by location to Payroll." *Id.* ¶ 52. Once access to the

Kronos database was restored, MHM would use the Centurion Hours Tracker "as a tracking mechanism for reconciliation purposes and to validate time entries in Kronos once access to the Kronos database was restored." *Id.* ¶ 57.

To calculate pay, MHM "us[ed] the hours recorded for the prior pay period ending 12/4/2021, modifying based on known variables." *Id.* ¶ 53. For example, MHM removed holiday hours because Thanksgiving fell during the prior pay period and removed any leave without pay from the prior pay period. *Id.* ¶ 54. MHM disseminated the following information to its employees regarding the pay estimates it made during the Kronos outage:

12. The prior pay period contained a holiday; how will that be handled?

We will remove the holiday hours from the last pay period and reconcile the hours so that no one loses the paid time.

13. I had leave without pay last pay period; how will I be compensated?

We are removing any leave without pay from the last period since we cannot collect the data to verify. We will reconcile all full- and part-time eligible staff who are significantly short on hours stemming from unpaid time in the prior pay period. Our goal is to not negatively impact employees.

16. I'm an hourly employee who receives a shift differential for worked shifts; how will I be paid my shift differential?

We are using worked hours from the prior pay period in order to process payroll. Therefore, shift differentials will be based on hours worked from the prior pay period. We Will reconcile all pay with actuals once our access to the Kronos database is restored.

17. I earn shift bonuses due to a critical shortage at my work site, or other bonus pay (with the exception of Arizona shift bonuses); how will I be compensated?

Shift bonuses are handled by the individual contracts (not in Kronos). Please reach out to your site supervisor to ensure your shift bonuses or other bonus payments are sent to the Regional Office for submission to Payroll for processing for 12/23/2021. Shift bonuses or other bonus/on-call pay that was paid on 12/10/2021 will NOT be included for 12/23/2021 (with the exception of Arizona shift bonuses).

18. I received an Arizona shift bonus last pay period, but the payment is not due this pay period; will I be paid a shift bonus?

As Arizona shift bonuses are handled in Kronos, the Arizona shift bonuses will be calculated based on hours worked from the prior pay period. We will reconcile all pay with actuals once our access to the Kronos database is restored.

19. I worked overtime this pay period; how will I be compensated?

Overtime will be calculated based on hours worked from the prior pay period. As the Thanksgiving holiday was a premium holiday for which overtime is paid for essential staff, we may overpay overtime because of shifts worked on Thanksgiving. Additionally, as non-essential staff may have not incurred overtime last pay period but did incur overtime this pay period. we will reconcile overtime pay once our access to the Kronos database is restored.

Doc. [102-5] at 3.

MHM's Director of Payroll Ashley Taylor stated that it would have been "impossible" for MHM to use the Centurion Hours Tracker to calculate pay.

Q: And how was the decision made not to use those hours trackers to calculate pay, but only as a sort of a double-check for the Kronos data once it came back online?

A: So, essentially, in order to calculate pay, you have to have all the setup of a timekeeping system and a database. And, unfortunately, in the healthcare industry, especially in the correctional healthcare industry, the setup is quite complex. So we have shift differentials, all of that data is set up in our timekeeping system. Those are specific by contracts, sometimes by specific facility and by state. All of our overtime calculations are held within the timekeeping database, so that's all there. When I referenced employees that are paid maybe a different pay rate for working a different job, that's all set up within that database. All those exceptions are kind of set up there. Rounding rules, so whether or not time's rounded to the quarter hour, that's all set up in that database. The California rules for double time is all set up in the database. They're kind of complex tables and all that data resides in a timekeeping system []. So that data all exists in our timekeeping system. Essentially, what we would have had to do – we can set up a tracker, right, for time and punches, but what our analytic team would have had to do to have it calculate pay is essentially set up a timekeeping database for us and essentially build a new timekeeping system for us overnight, which isn't possible for them to build us an ad hoc timekeeping system overnight for us to utilize and have it be accurate, based on the complexity of our setup across the company. It just wasn't – we couldn't – we couldn't do that. They don't have the resources. If they – if we did, we would be using our own timekeeping database, we wouldn't be using another system.

Q: I can rephrase. You said it would be impossible to do it, right? But I assume that since you are not a person who's building the database that you received information from somewhere –

A: Yes.

Q: that it's impossible to do, and then you took that information and a determination was made that this is impossible, so we're only going to use this data to track time as opposed to use it for payroll, right?

A: Yes. So I did talk to them at length and said, These are the shift differentials. Like this is what – you know what we pay. This is the complexity. These are – these are all the contracts and were [sic] we round and where we don't. This is the – this is the overtime calculation, this is how you would have to apply it. This is where you would have to apply double time. And, essentially, they basically came back with, We can't

5

> build that out.  Like, there's – it would take months and months and months and months and months to build out a database that is that complex.  There's – there's no way for their team to overnight build a database to calculate pay that we – like to essentially calculate what Kronos was doing for us and for us overnight.

Doc. [102] ¶ 59 (Transcript of Deposition of Ashley Taylor, 88:9-91:3).

Because MHM used the hours recorded for the prior pay period to calculate pay, MHM informed its employees that the paychecks may not be accurate, stating for example, "we may overpay overtime because of shifts worked on Thanksgiving," and "[w]e will reconcile all pay with actuals once our access to the Kronos database is restored."  Doc. [102-5] at 3.  On January 5, 2022, MHM informed its employees that those underpaid 25% or more could submit requests to receive adjustments to their pay.  Doc. [102] ¶ 66.

On January 19, 2022, access to the Kronos database was restored to "a limited number of people in order to secure the database for validation and to conserve database bandwidth to restore connections to time clocks, load employee data, and load Centurion Hours Tracker data to the database without impacting system availability."  *Id.* ¶ 73.  On January 24th, managers and supervisors were given access to the Kronos database to "review/edit time and prepare for the upcoming regular payroll date (February 4)."  *Id.* ¶ 74.  Next, the Payroll Department had to review the "interfaces" in Kronos, upload missing interfaces, and update employee human resource files.  *Id.* ¶ 76.  "Each employee file 'took a couple hours to run' so it took 'several days' to get 'everything back to where it needed to be, because the system had been offline for six weeks."  *Id.* ¶ 76.  Then MHM uploaded data from the Centurion Hours Tracker spreadsheet into Kronos and imported time punch data.  *Id.* ¶ 77.  MHM first focused on running an accurate payroll for the February 4th pay date.  *Id.* ¶ 80.  To explain why it couldn't begin the reconciliation process for the three pay periods covered by the Kronos outage until after completing the February 4th payroll, MHM asserts that it took managers significant time to "review and/or edit six weeks of employees' Kronos time entries" for the reconciliation payments.  *Id.* ¶ 81.  On January 24th, MHM informed employees that Kronos was online after MHM had "completed the validation step of the Kronos Recovery Process" and that "the reconciliation process will begin once the pay period ending January 29 has been signed off by Corporate Payroll."  *Id.* ¶ 83.  On January 26th, MHM ran an out-of-cycle payroll for employees underpaid by more than 40 hours.  *Id.* ¶ 82.  For everyone else, MHM finalized the reconciliation payrolls on February 22nd and paid underpaid employees on February 25th.  *Id.* ¶¶ 84-85, 88.

6

MHM sent "reconciliation payments" on February 25th to employees who were "net overpaid or paid correctly during the Kronos outage period." *Id.* ¶ 87. Further, MHM made "nominal" payments to some employees on the February 25th reconciliation pay date, explaining "this was due to the UKG's use of bankers rounding and the adjustments for the six-week period being loaded into one adjustment payroll." *Id.* ¶ 92. MHM claims that it made reconciliation payments prior to the date Lewis filed her First Amended Complaint against MHM. *Id.* ¶ 88. But it appears Lewis filed her initial complaint on February 24, 2022, the day *before* MHM made reconciliation payments, though she originally named the wrong corporate entity. *See* Doc. [1].

To its statement of material facts, MHM attached a table of under and over-payments, which lists in its three columns (1) the name of each opt-in plaintiff, (2) "Underpayment Paid of Feb. 25, 2022" and (3) Original Overpayment. Doc. [102-18]. For example, Jessica Gonzalez was paid 17 cents to compensate for her prior underpayment, but was originally overpaid $3,862, according to the table. *Id.* at 2. The 17-cent payment likely counts as a "nominal" payment made by MHM to reconcile rounding errors. Doc. [102] ¶ 92. As another example, Jamie Pemberton was paid $3,362.84 on February 25, 2022, to compensate her for her prior underpayment. Doc. [102-18]. Most critically for its employees, MHM appears to have subtracted accidental overpayments from future employee paychecks. Doc. [102] ¶ 67. "For overpayments, MHM was concerned that when it went back to do the reconciliation and employees found out they had to pay back a large amount of money, the employees would be irritated." *Id.* To alleviate that concern, MHM alerted employees that either the employee or their manager could notify the Payroll Department of overpayments, "and Payroll would make adjustments in the next period." *Id.* MHM asserts that it "flagged" severe overpayments or underpayments "to lessen the financial impact on employees." *Id.* ¶ 65.

MHM alleges that, of its "5,859 non-exempt employees, during the Kronos period: 2,825 were net overpaid; 2,714 were net underpaid; and 320 were paid net-neutral." *Id.* ¶ 89. Further, MHM alleges that during the Kronos outage period, it overpaid its employees by $2,773,679.91. *Id.* ¶ 90. Though MHM indicates that it overpaid its employees, its filings suggest that employees had to pay back the amounts MHM overpaid them, whether directly or through a decrease in their next paycheck. *See* Doc. [102] ¶ 67. In contrast, Plaintiff alleges, "[b]ecause MHM's reconciliation process was improper, wages remain owed to affected employees as of today's date." Doc. [120-1] ¶ 46. She claims MHM "unlawfully aggregate[s] damages from

7

multiple workweeks[.]" *Id.* And she denies that MHM worked "very quickly" to manage its response to the Kronos outage or that it was "impossible" for MHM to use the data from its Centurion Hours Tracker to calculate wage payments earlier. *Id.* ¶¶ 46, 56. In its reply to Plaintiff's response to its statement of material facts, MHM appears to take umbrage at Plaintiff's assertion that MHM possessed all information required to timely pay its employees during the outage. *See* Doc. [135] ¶ 20 ("Plaintiffs baldly assert, 'MHM had all information and formulas required to ***timely*** pay its employees for all hours worked from early in the outage.'"). But MHM does not directly assert that it lacked the information to pay its employees during the Kronos outage.

MHM provides a table detailing its payroll processing dates, noting the dates it paid employees their estimated, inaccurate wages for three impacted pay periods: December 23, 2021, for the pay period running December 5th through 18th; January 7, 2022, for the pay period running December 19th through January 1st; and January 21, 2022, for the pay period running January 2nd through 15th. Doc. [102] ¶ 97. Subsequently, "using [accurate] Kronos time data," MHM paid employees two regular paychecks from two pay periods before completing its reconciliation process. *Id.* ¶ 97. MHM paid employees on February 4, 2022, for the pay period running January 16th through 29th, then paid employees on February 18, 2022, for the pay period running January 30th through February 12th, but it did not make its reconciliation payments until February 25, 2022. *Id.* ¶ 97.

Plaintiff brings Kronos-related claims under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq; the Arizona Wage Act (AWA), ARIZ. REV. STAT. ANN. § 23-350 et seq. (2018); and Arizona common law. Doc. [106] at 22, 24, 26.

LEGAL STANDARD

A court must grant a motion for summary judgment if it finds, based on the factual record, that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56. Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to

8

interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quotation marks omitted). The non-movant must then "present specific evidence, beyond 'mere denials or allegations [that] . . . raise a genuine issue for trial.'" *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (quoting *Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1078-79 (8th Cir. 2008)). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). The evidence must be viewed "in the light most favorable to, and making all reasonable inferences for, the nonmoving party." *Carmody v. Kansas City Bd. of Police Comm'rs*, 713 F.3d 401, 404 (8th Cir. 2013). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). "'If reasonable minds could differ as to the import of the evidence,' summary judgment is inappropriate." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996) (quoting *Anderson*, 477 U.S. at 256).

### DISCUSSION

As set forth below, Defendant has not met the standard for summary judgment on Plaintiff's FLSA or state-law Kronos-related claims.

I.   **Plaintiff has not demonstrated that ruling on summary judgment is premature.**

Plaintiff first asserts that Defendant's motion should be denied as premature because the parties have not conducted discovery on the merits. *See* Doc. [120] at 5. According to Plaintiff, the parties "specifically agreed to divide discovery into separate collective/class discovery and merits discovery phases." *Id*. at 6. Defendant counters that the parties' Revised Joint Proposed Scheduling Plan specifically states: "[t]he splitting of discovery into two phases, by itself, does not require any particular subject of discovery be made part of Phase One or Two because it may not be possible to clearly and formally divide collective, class, and merits discovery." Doc. [51]. Defendant further notes that Plaintiff has failed to submit a Rule 56(d) affidavit in support of its request to conduct additional discovery. Doc. [139] at 11.

"Although discovery does not have to be completed before a district court can grant summary judgment, 'summary judgment is proper only after the nonmovant has had adequate

9

time for discovery.'" *Ray v. Am. Airlines, Inc.*, 609 F.3d 917, 923 (8th Cir. 2010) (citing *In re TMJ Litigation,* 113 F.3d 1484, 1490 (8th Cir. 1997)). "Rule 56(f)—recodified 'without substantial change' as Rule 56(d) effective December 1, 2010—authorizes a district court to defer considering a motion for summary judgment if a party opposing the motion 'shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition.'" *Chambers v. Travelers Companies, Inc.*, 668 F.3d 559, 568 (8th Cir. 2012). But Rule 56(d) "is not a shield that can be raised to block a motion for summary judgment without even the slightest showing by the opposing party that his opposition is meritorious." *Hamilton v. Bangs, McCullen, Butler, Foye & Simmons, LLP*, 687 F.3d 1045, 1049 (8th Cir. 2012)[4] (quoting *Humphreys v. Roche Biomedical Labs., Inc.*, 990 F.2d 1078, 1081 (8th Cir. 1993)). "A Rule [56(d)] affidavit must set forth specific facts further discovery might uncover, or what information further discovery might reveal." *Id*. "Unless a party files an affidavit under Federal Rule of Civil Procedure [56(d)] showing what facts further discovery may uncover, 'a district court generally does not abuse its discretion in granting summary judgment on the basis of the record before it.'" *Ballard v. Heineman*, 548 F.3d 1132, 1137 (8th Cir. 2008) (citing *Nolan v. Thompson*, 521 F.3d 983, 986 (8th Cir. 2008)). "The purpose of the affidavit is to ensure that the nonmoving party is invoking the protection of Rule 56(f) in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition." *First Chi. Int'l v. United Exch. Co., LTD,* 836 F.2d 1375 (D.C. Cir. 1988) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 298 (1968)).

In this circuit, Plaintiff's failure to file a Rule 56(d) affidavit is generally sufficient to allow the Court to proceed with reviewing Defendant's motion for summary judgment.[5] *See Ballard*, 548 F.3d at 1137 ("Because [plaintiff] never filed a proper Rule [56(d)] motion, the district court did not abuse its discretion by granting summary judgment on the record before it."). But even if the Court were to overlook Plaintiff's failure to submit a Rule 56(d) affidavit, it

---

[4] Plaintiff's reliance on *Hamilton* is misplaced. *See* Doc. [120] at 5. *Hamilton* upheld a district court's denial of a motion to postpone summary judgment because the affidavit lacked the requisite specificity. *See* 687 F.3d at 1049-50.

[5] Plaintiff cannot plead ignorance. She chose not to file a Rule 56(d) affidavit even after she was put on notice by MHM that one was required. *See* Doc. [139] at 6. And Plaintiff's counsel has filed a Rule 56(d) affidavit in another case. *See Gaul v. Accura Health Ventures, LLC*, No. 4:22-CV-00154-SHL-HCA (S.D. Iowa Nov. 23, 2022), Doc. [23-2] (affidavit).

would still proceed with MHM's motion, as Plaintiff has failed to articulate missing facts necessary to ruling on summary judgment.  Plaintiff states merely that, "[i]n response to [Defendant's] statement of facts, Plaintiffs have identified numerous issues which require additional discovery before Plaintiffs can fairly be expected to admit or deny the purported facts MHM includes."  Doc. [120] at 8.

In fact, throughout its response, instead of identifying specific information that it needs to adequately respond, Plaintiff repeats the same conclusory claim that she is "is unable to admit or deny the accuracy of the testimony, because Plaintiff has had an insufficient opportunity for discovery."  *See e.g.*, Doc. [120-1] ¶¶ 20, 43-45, 47, 65, 71, 73-82, 84, 86-90.  But MHM has produced individuals for depositions and responded to Plaintiff's discovery requests.  *See, e.g.*, Doc. [120-5] (Deposition Transcript of Ashley Taylor, MHM Senior Director of Payroll); Doc. [120-3] (Defendant's response to Plaintiff's Requests for Production); Doc. [88-4] (Deposition Transcript of Grant Roberts, MHM's 30(b)(6) Corporate Representative).  And Plaintiff does not point to specific facts that she expects additional discovery would reveal without which she is unable to respond.  The Court therefore rejects her request for additional discovery under Rule 56(d) and takes up the merits of MHM's Motion for Partial Summary Judgment on Plaintiff's Kronos-Related Claims, Doc. [101].

II.     **Summary judgment is not warranted on the Kronos FLSA claim.**

A. **The FLSA requires overtime compensation to be paid on time unless it cannot be determined, in which case it is due "as soon as practicable."**

"The purpose of the FLSA 'is to protect the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others.'" *Specht v. City of Sioux Falls*, 639 F.3d 814, 819 (8th Cir. 2011) (quoting *Benshoff v. City of Va. Beach*, 180 F.3d 136, 140 (4th Cir. 1999)).  "It does so in part by setting forth substantive wage, hour, and overtime standards." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 11 (2011).  One such provision is that "no employer shall . . . [have a] workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).  Per the Eighth Circuit, FLSA exemptions should be strictly construed, *Nw. Airlines v. Jackson*, 185 F.2d 74, 77 (8th Cir. 1950), and remedial provisions

should be given a "generous reading, in favor of those whom [C]ongress intended to benefit from the law." *Kelley v. Alamo*, 964 F.2d 747, 750 (8th Cir. 1992).

Plaintiff argues that MHM violated the FLSA's overtime requirement in two ways: (1) by failing to timely pay overtime compensation during the Kronos outage, Doc. [120] at 4, and (2) by 'netting' pay periods, subtracting underpayments from one period from overpayments in another pay period to calculate its reconciliation payments, arguing that each pay period must stand alone under the FLSA, *id.* at 5. MHM concedes that most opt-in plaintiffs are not exempt from FLSA requirements.[6] But MHM maintains that it complied with the FLSA by making proper payments as soon as possible given the Kronos outage. Doc. [104] at 9.

"[N]either the FLSA nor its regulations 'specifically address when overtime compensation must be paid.'" *Speer v. Cerner Corp.*, 2017 WL 1036135, at *3 (W.D. Mo. Mar. 17, 2017) (quoting *Brooks v. Vill. of Ridgefield Park*, 185 F.3d 130, 135 (3d Cir. 1999)). According to a 1968 Department of Labor interpretive bulletin, "[t]he general rule is that overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends," but "[w]hen the correct amount of overtime compensation cannot be determined until some time after the regular pay period, . . . the requirements of the Act will be satisfied if the employer pays the excess overtime compensation as soon after the regular pay period as is practicable." 29 C.F.R. § 778.106. "Payment may not be delayed for a period longer than is reasonably necessary for the employer to compute and arrange for payment of the amount due and in no event may payment be delayed beyond the next payday after such computation can be made." *Id.*

The Department's interpretive bulletin is not binding on this Court, *see Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (1944), but the Department's interpretation is (a) longstanding; (b) consistent with even-longer-standing Supreme Court precedent, *Walling v. Harnischfeger*

---

[6] Exceptions include Diana Curd, a salaried exempt employee, Tia Page-Roundtree, who MHM alleges was not employed by it, and Caryn Penn and Sandra Solis, who MHM alleges terminated their employment with MHM prior to the outage. Doc. [104] at 18; Doc. [102-18].

*Corp.*, 325 U.S. 427, 432–33 (1945);[7] (c) the basis for many rulings of federal courts;[8] and (d) not seriously disputed by the parties.[9]  Therefore, the Court follows *Harnischfeger* and 29 C.F.R. § 778.106 in asking, first, whether MHM paid its employees properly calculated overtime compensation by their established pay day.  If it did not, then MHM is not entitled to summary judgment unless undisputed facts show that such compensation could not be determined until after the regular pay period *and* that MHM paid it as soon as practicable.

### B. A genuine dispute of material fact as to whether MHM made payments "as soon as practicable" precludes summary judgment on Plaintiff's FLSA claim.

MHM does not claim to have paid its employees their properly calculated overtime compensation by their regular paydays.  It claims that it was not possible to determine its employees' overtime pay accurately during the Kronos outage, and so it compensated them as soon as practicable thereafter.  *See* Doc. [104] at 16-21.  In support of summary judgment, MHM points to evidence of how challenging it was to address the question of payroll during the Kronos

---

[7] Rejecting the argument that the FLSA could not require overtime compensation to be based on incentive bonuses that were not determinable until after the regular payday, the Supreme Court held in *Harnischfeger*, 325 U.S. at 432-33, that "Section 7(a) does not require the impossible.  If the correct overtime compensation cannot be determined until some time after the regular pay period," employees must be paid their properly calculated overtime compensation "as soon as convenient or practicable under the circumstances."

[8] *See, e.g.*, *Avalos v. United States*, 54 F.4th 1343, 1346, 1349-1354 (Fed. Cir. 2022) (employer did not violate FLSA when it made no wage payments for more than one month, finding payments were made "at the earliest possible date"); *Brooks*, 185 F.3d at 135 (Third Circuit applying 'soon as practicable' standard); *O'Brien v. Town of Agawam,* 350 F.3d 279, 298 (1st Cir. 2003) ("[T]he Secretary's rule that overtime payments must be made as soon as practicable provides a clear and useful test for when wages become 'unpaid' under the [FLSA]"); *Speer*, 2017 WL 1036135, at *3 (collecting cases); *Nell v. City of N.Y.*, No. 19 Civ. 6702 (LGS), 2021 WL 2716523, at *8 (S.D.N.Y. July 1, 2021) ("The FLSA is satisfied 'if the employer pays the excess overtime compensation as soon after the regular pay period as is practicable.'") (quoting 29 C.F.R. § 778.106); *Adams v. City of N.Y.*, 2021 WL 1791182, at *8 (S.D.N.Y. May 5, 2021) ("An employer's liability for delayed overtime payments therefore hinges not only on when the payments were made, but also on whether the employer took efforts to make the payments 'as soon after the regular pay period as is practicable'") (quoting 29 C.F.R. § 778.106).

[9] Although Plaintiff cites comparatively stark formulations of the FLSA's requirements from the case law, *see* Doc. [120] at 9 (citing, e.g., *Herman v. Fabri-Centers of Am., Inc.*, 308 F.3d 580, 590–91 (6th Cir. 2002) ("[T]he [FLSA] is violated even if the employer eventually pays the overtime amount that was due."); *Biggs v. Wilson*, 1 F.3d 1537, 1541 (9th Cir. 1992) ("If a payday has passed without payment, the employer cannot have met his obligation to 'pay.'")), in the same breath she urges the Court to rely on 29 C.F.R. § 778.106 as persuasive authority in part because of its consistency with those cases, *see* Doc. [120] at 9, and acknowledges that it "permits some room for late payment in weeks in which the correct compensation '**cannot** be determined until sometime after the regular pay period,'" *id.* at 11 (quoting 29 C.F.R. § 778.106).

outage, how hard MHM worked to figure out how to track personnel information during the outage, the approach it chose, and why its solution was not a bad deal for MHM employees, and how transparent MHM was with those employees during the process. *See id.* at 17-18. The upshot, MHM argues, is that "MHM ensured that its employees were properly paid all wages due (including overtime) as soon as was practicable in accordance with *Harnischfeger* and Section 778.106." *Id.* at 17.

Plaintiff counters by pointing to evidence that that MHM collected accurate time data from employees "but elected not to use those hours to calculate pay during the outage[,]" instead choosing to duplicate prior pay periods, resulting in inaccurate payments. Doc. [120] at 4; Doc. [120-1] ¶ 58 ("MHM had all information and formulas required to timely pay its employees for all hours worked."). In support, Plaintiff cites the "Kronos Outage FAQ"—a document MHM provided to its employees during the outage, describing the requirement that they track all of their hours in the "Centurion Hours Tracker." Doc. [102-5] at 2. The FAQ document urges employees who might not remember hours worked to "work with their managers to document time they can't remember to get it as close to accurate as possible." *Id.* It states that "[a]t this time, this process is not being used for pay but for reconciliation and validation." *Id.* And then it outlines how MHM is planning to pay employees on their scheduled pay date but "the paychecks will not be accurate," because the company "will be using the hours recorded for the prior pay period ending 12/4/2021, modifying based on known variables such as those outlined in this document. We will reconcile all pay with actuals once our access to the Kronos database is restored." *Id.* at 3. Plaintiff also points to the deposition testimony of MHM's corporate representative, Ashley Taylor, confirming that all employees were required to use the Centurial Hours Tracker as an alternative method of tracking their time. Doc. [120-5] at 85:18-24.

In reply, Defendant urges the Court to award it summary judgment because Plaintiff failed to point to "specific counter-facts" to its corporate representative's testimony that, "[w]ithout Kronos, there was no automated way to do [certain payroll] calculations." *See* Doc. [135] ¶ 20; *see also* Doc. [139] at 13-15; Doc. [157-1] at 4 (complaining that Plaintiff has not proven that Defendant *could have* calculated all of its employees' overtime compensation within the relevant time period). That argument misunderstands Plaintiff's burden at summary judgment. Plaintiff does not have to produce evidence that affirmatively disproves that particular piece of testimony. She does not even have to show that the inferences she wants the jury to

14

draw from the record are more plausible than those proposed by MHM.  All she has to do is point to specific evidence in the record (*e.g.*, the fact that the company collected the relevant data during the outage) that creates a genuine issue for trial (e.g., whether Ms. Taylor's testimony that MHM did the best they could do under the circumstances is credible).  *Farver*, 931 F.3d at 811.  She has done that.

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, a reasonable juror could find that MHM did not pay its employees their properly calculated overtime compensation as soon as practicable.  *Carmody*, 713 F.3d at 404; *see also Gaul v. Accura Health Ventures, LLC*, 651 F. Supp. 3d 1054, 1063-64 (S.D. Iowa 2023) (denying summary judgment based on evidence that the employer tracked employee hours during the Kronos outage).  Both parties point to aspects of MHM's communications and Ms. Taylor's testimony that support the inferences they want the jury to draw.  The credibility of that testimony and the relative plausibility of those inferences are questions for a jury, not a judge. *Torgerson*, 643 F.3d at 1042.

The Southern District of Iowa denied summary judgment in another FLSA case arising from the Kronos outage, explaining that an FLSA cause of action must accrue on the date the wages were due, because to hold otherwise would mean "an underpaid employee does not have a claim until the passage of an indeterminate period after payday during which the employer might take corrective action or make other mistakes that 'balance out' the first one."  *Gaul*, 651 F. Supp. 3d at 1063.  Like here, after Accura's timekeeping system Kronos was taken down by the ransomware attack, the company implemented a manual timesheet system to track employee hours but did not use the manual timesheet to pay employees.  *Id.* at 1064.  The Court denied summary judgment, explaining that "calculating Gaul's overtime pay therefore was a matter of simple arithmetic . . . The Kronos outage did not make this math any more challenging."  *Id.* at 1064.  Plaintiff likens her situation to Gaul's:  Their employer had a manual timekeeping system that provided all the necessary information to pay employees wages on the dates they were due but declined to use its manual system to do so.  Doc. [120] at 12.

MHM tries to distinguish this case from *Gaul* but does not succeed.  The fact that it took Accura several more months than it took MHM to complete its reconciliation payments after the Kronos outage does not mean that the time it took MHM was acceptable.  *See* Doc. [104] at 19. MHM also notes that the *Gaul* court found § 778.106 inapplicable because Accura had actual

15

information about its employees' hours worked and thus had no reason to delay its reconciliation payments. *Id.* MHM argues that, unlike Accura, it would not have been practicable to do manual calculations because it had no record of actual hours worked and because it had a relatively large number of employees. *Id.* at 20-21 ("Indeed, the *Gaul* Court noted that defendant had a "stronger defense" for at least one pay period where 'it had no record of actual hours.' That is this case. . . . MHM was not feasibly able to adopt a solution for its substantially larger employee population.") (internal citation omitted). But the putative differences between *Gaul* and this case are matters of degree, not kind. MHM may have a stronger argument to make to a jury on practicability than Accura does, but it has not shown that no reasonable factfinder could find for Plaintiff on the question.

Plaintiff also cites *Albert v. Honda Development & Manufacturing of America, LLC*, as additional support for the contention that experiencing a Kronos hack does not necessarily absolve an employer from FLSA liability for late wage payments. 792 F.Supp.3d 855, 865 (S.D. Ohio). In *Honda*, the court found that Honda had not shown that its overtime payments were delayed only as much as was "reasonably necessary" and denied its motion for summary judgment, holding the "reasonably necessary' inquiry was a factual issue inappropriate for resolution at summary judgment. *Id.* MHM seeks to distinguish *Honda* by noting that plaintiffs there focused on (1) Honda's reckless failure to prepare itself for the Kronos outage, (2) Honda's lack of a backup plan despite its awareness of cyber security risks and (3) expert testimony on disaster preparedness and standard payroll practices. Doc. [157-1] at 3. MHM's efforts are unavailing. Fulsome discovery may reveal that all of those features of *Honda* apply equally here.[10] MHM appears to have not prepared itself for the outage or made a backup plan—MHM asserts that it didn't know that its backup Kronos database was stored in the same cloud as the production database, making it useless if the other is inaccessible, as here, following the ransomware attack. Docs. [102] ¶¶ 14, 40, 45; [157-1] at 5. Though MHM blames Kronos for "fail[ing] to give notice" regarding the backup database's cloud storage, such a fact could also be construed as a failure on the part of MHM to prepare a backup plan in the event of disaster. Docs. [157-1] at 5; [102] ¶¶ 45.

---

[10] The parties agreed to conduct discovery in two phases, beginning with discovery related to conditional certification. Doc. [51] at 1. The Case Management Order, Doc. [52], set deadlines only for discovery relating to class certification, with regular discovery to follow its ruling on conditional certification.

MHM also tries to assimilate the Kronos outage to a "natural disaster[] or similar event[] wholly beyond the control of the employer," wherein "an employer does not violate the statute when it makes late payments."  Doc. [104] at 14 (quoting *Ortega v. Due Fratelli, Inc.*, 2015 WL 7731863, at *7 (N.D. Ill. Dec. 1, 2015)).  As other district courts have warned, in order to qualify for that exception to the FLSA, the event must be a truly "exceptional circumstance" not caused by an employer; for example, "[a]n employer may not set up an inefficient accounting procedure and then claim it is not responsible for timely payment of wages due to its own incompetence." *Ortega*, 2015 WL 7731863, at *7 (quoting *Dominici v. Bd. of Educ. of City of Chicago*, 881 F. Supp. 315, 320 (N.D. Ill. 1995).  The Court is not persuaded that no reasonable factfinder could find that MHM was in any way responsible for the untimeliness of its payroll after the Kronos outage.

As evidence of its diligence, MHM reports that after the Kronos database was restored, it "ran an out-of-cycle payroll on January 26 for anyone who had been underpaid by more than 40 hours.  MHM acted so quickly not because of fear of litigation, but because it was the right thing to do for its employees, who were also innocent victims of the Kronos hack."  Doc. [104] at 8. Apart from raising a question of how MHM was able to run payroll on January 26th for some employees but found it "impossible" to make full reconciliation payments for other employees until nearly a month later, Doc. [104] at 18, that fact is beside the point.  Further, MHM focuses the Court's attention on its candor in telling its employees that "[some] would be underpaid and others would be overpaid," the fact that it communicated information about late payments "in a transparent and honest way," and made reconciliation payments before this lawsuit was filed. Doc. [104] at 8.  Unfortunately for MHM, clearly communicating its failure to pay employees their wages due is not a defense against FLSA liability.

Notwithstanding MHM's diligence and candor, a reasonable juror could find that MHM's failure to properly pay non-exempt employees their wages owed before February 22nd does not amount to paying employees "as soon as practicable."  Doc. [104] at 19.  For example, a reasonable juror could find that MHM could have practically paid its employees sooner by manually calculating wages using the Centurion Hours Tracker, as Plaintiff argues.  *See* Doc. [120] at 12.  Because whether MHM made payments as soon as practicable is a fact issue, and "reasonable minds could differ as to the import of the evidence," summary judgment is not warranted on Plaintiff's FLSA claim.  *Quick*, 90 F.3d at 1377.

17

### III.    State Law Claims

#### A.  Factual disputes preclude summary judgment on the Arizona Wage Act claim.

The Arizona Wage Act (AWA) provides, in relevant part, that "no employer may withhold or divert any portion of an employee's wages unless . . . [t]he employer is required or empowered to do so by state or federal law[, . . . or] [t]here is a reasonable good faith dispute as to the amount of wages due . . . ."  ARIZ. REV. STAT. ANN. § 23-352; *see, e.g.*, *Patton v. Mohave Cnty.*, 741 P.2d 301, 305 (Ariz. Ct. App. 1987).  "[I]f an employer . . . fails to pay wages due any employee, the employee may recover in a civil action against an employer or former employer an amount that is treble the amount of the unpaid wages."  ARIZ. REV. STAT. ANN. § 23-355.

MHM argues that it is entitled to summary judgment on Plaintiff's AWA claims because (1) it was "empowered" by the FLSA to make payments "as soon as practicable," and (2) until it was able to accurately calculate the wages due, there were a "reasonable good-faith dispute as to the amount of wages due," either one of which excuses it from AWA liability.  Doc. [104] at 21; ARIZ. REV. STAT. ANN. § 23-352 (2018).  That argument fails for the same reasons as MHM's argument for summary judgment under FLSA.  Even assuming that FLSA "empowered" MHM to "withhold or divert" some employees' wages under the circumstances of the Kronos outage—which the Court does not decide—on the record before the Court, viewed in the light most favorable to Plaintiff, a reasonable juror could find that MHM did not pay its employees' properly calculated overtime wages "as soon as practicable."  The same juror, on the same record, could find that MHM's efforts to do so did not amount to a "reasonable good faith dispute over as to the amount of wages due."  Because "'reasonable minds could differ as to the import of the evidence" as to each of those questions, summary judgment on the AWA claims is inappropriate.  *Quick*, 90 F.3d at 1377 (quoting *Anderson,* 477 U.S. at 256).

#### C.  Summary judgment is not warranted on Plaintiff's state common law claim.

Under Arizona law, an unjust enrichment claim has five elements: "(1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law."  *Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011) (citing *City of Sierra Vista v. Cochise Enters., Inc.*, 697 P.2d 1125, 1131–32 (Ariz. Ct. App. 1984)).

MHM's claim to summary judgment on Plaintiff's unjust enrichment claim mimics its argument for the AWA and FLSA claims: "MHM paid its employees all overtime due during the

18

Kronos outage period as soon as practicable." Doc. [104] at 23.  As stated above, whether MHM acted "as soon as practicable" is a disputed material fact.  Because MHM has not demonstrated that "there is no genuine issue as to any material fact and that [Defendant] is entitled to a judgment as a matter of law," *Celotex Corp.*, 477 U.S. at 322, the Court declines to grant summary judgment on Plaintiff's common law claims.[11]

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Partial Summary Judgment on Plaintiff's Kronos-Related Claims, Doc. [101], is **DENIED.**

Dated this 31st day of March, 2026.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE

---

[11] "[A]lthough [Plaintiff] did not specifically plead [her statutory and common law claims] in the alternative . . . , she will not be able to recover double damages for the same injury." *Davenport v. Charter Commc'ns, LLC*, 2012 WL 5050580, at *3 (E.D. Mo. Oct. 18, 2012).