UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| PENNY LEWIS, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Case No. 4:22-cv-00228-SEP |
| | ) | |
| MHM HEALTH PROFESSIONALS, LLC, | ) ) | |
| Defendant. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

Before the Court are Plaintiff's Motion for Conditional Certification Pursuant to the Fair Labor Standards Act, Doc. [87], and Motion for Class Certification Pursuant to Federal Rule of Civil Procedure 23, Doc. [88].[1]  For the reasons set forth below, the motions are granted in part and denied in part.

**FACTS AND BACKGROUND**

Plaintiff proposes to sue under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq., and the Arizona Wage Act (AWA), ARIZ. REV. STAT. § 23-350, on behalf of six classes of individuals:  two classes each for her Kronos claims, meal break claims and security screening claims.  *See* Doc. [106] ¶¶ 35-42.  Because the security screening claims under both statutes have been dismissed,[2] four proposed classes remain for the Court's consideration:  the FLSA Kronos Collective, AWA Kronos Class, FLSA Meal Break Collective, and AWA Meal Break class.[3] Facts regarding the Kronos and security screening claims are set forth elsewhere, *see* Doc. [159]

---

[1] Because the docket text and supporting documents for Doc. [88], including the supporting memorandum filed at Doc. [99], suggest that Plaintiff intended to file a Motion for Class Certification Under Rule 23 as Doc. [88], rather than a duplicate of the Motion for Conditional Certification Under the FLSA filed at Doc. [87], the Court treats it as such.

[2] *See* Doc. [96] (dismissing Plaintiff's security screening claims under the FLSA) and Doc. [160] (dismissing Plaintiff's security screening claims under the AWA).  "Courts agree that an FLSA plaintiff who fails to state a viable claim cannot represent others who are similarly situated." *Wass v. Dolgencorp, LLC*, 2014 WL 5307505, at *1 (W.D. Mo. Oct. 16, 2014) (collecting cases, including *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 877-78 (6th Cir. 2012)).  "Thus, where a motion for summary judgment is granted in full, a pending motion for conditional certification becomes moot." *Id.* at *2 (citing *Smith v. Johnson & Johnson*, 593 F.3d 280, 283 (3d Cir. 2010)).

[3] Summary judgment was denied on the Kronos claims, *see* Doc. [159], and no summary judgment motion was filed regarding meal break claims.

1

at 1-8 and Doc. [160] at 1-2,[4] and need not be repeated here, but facts relevant to the meal break claims and the certification motions are as follows.

On October 5, 2022, the Court issued a Case Management Order (CMO) that set a January 20, 2023, deadline for all discovery relating to conditional class certification issues, providing 10 depositions and 25 interrogatories per side.  Doc. [52] at 1.  The CMO further set a February 10, 2023, deadline for a brief supporting or opposing conditional class certification, stating that an amended scheduling conference would be held following the Court's ruling on conditional class certification.  Doc. [52] at 2.  The CMO was subsequently amended twice by joint motion of the parties.  The operative CMO set an ultimate deadline of July 31, 2023, for discovery relating to conditional class certification issues.  Docs. [63], [81].  Discovery extended further, with depositions occurring in August 2023.  *See* Docs. [87-5], [87-6] (30(b)(6) depositions).  In other words, discovery took place for at least 11 months after the initial October 2022 issuance of a CMO.

Significant discovery was conducted.  Following a dispute concerning the scope of discovery on the Opt-In Plaintiffs, the Court allowed MHM to propound written discovery requests to each Opt-In Plaintiff and to depose ten of them.  Docs. [68], [69].  Plaintiffs issued 24 document requests and 10 interrogatories, and MHM produced 53,051 pages of documents. Doc. [112] ¶ 3.  Plaintiffs issued a corporate 30(b)(6) deposition notice with 21 topics.  *Id*. ¶ 4. MHM produced two corporate witnesses for deposition and submitted four additional interrogatory responses in lieu of testimony.  *Id*. ¶ 5.  MHM issued 10 interrogatories and 11 document requests to Plaintiff Lewis.  *Id*. ¶ 6.  MHM also propounded written discovery requests to each Opt-In Plaintiff, and deposed Lewis and ten Opt-In Plaintiffs.  *Id*. ¶ 7.  To date, Plaintiff has filed 31 written consents for Opt-In Plaintiffs who wish to join this action.  *See* Docs. [4], [5], [8-9], [18], [36], [53], [54], [56], [57], [77], [78].

MHM employed 5,859 non-exempt employees in the U.S. and 771 in Arizona during the Kronos outage period.  Doc. [88-6] at 2.  Plaintiff defines the Kronos outage period as beginning on or about December 11, 2021, until the time that MHM regained full access to all Kronos products and services, and resumed normal employee timekeeping and payment operations. Doc. [98] at 10.  Additionally, for purposes of the meal break class, MHM employed 1,995 non-exempt employees in Arizona during the period that MHM contracted with AZDOC, July 2019

---

[4] Unless otherwise noted, page numbers for docket entries refer to the CM/ECF page number.

to September 2022.  *Id.*; Doc. [98] at 10.  During that period, MHM contracted to provide healthcare staffing services at ten Arizona prison facilities 24 hours per day:  the Douglas, Eyman, Florence, Lewis, Perryville, Phoenix (Alhambra), Safford, Tucson, Winslow, and Yuma Complexes.  Doc. [115] at 11 n.15; Doc. [116] at 9 n.3; Doc. [112-1] 12:23-13:8, 25:12-16, 26:17-24, 30:15-31:11, 34:2-3 (Grant Roberts 30(b)(6) deposition excerpts); Doc. [88-6] at 11-12.  MHM also staffed two individuals at the Pima Detention Complex.  Doc. [115] at 11 n.15. At all the facilities except Pima, MHM employed a Facility Health Administrator (FHA) who managed healthcare administration at that facility.  Doc. [115] at 11-12; Doc. [112-1] 35:18-38:14.  Under the FHA, MHM also employed an Assistant Facility Health Administrator (AFHA), a medical director, a director of nursing, registered nurses (RNs), certified nursing assistants (CNAs), advanced nurse practitioners, physician assistants, dentists, dental assistants, and medical records clerks.  *Id.*

Pursuant to MHM's policy regarding meal and rests periods (Meal Policy), its timekeeping system would "automatically deduct a 30-minute lunch once the employee has worked over 6 hours."  Doc. [92-1] at 2.  If an employee worked through lunch or was unable to completely stop working over the lunch period, the employee was directed to complete a Timekeeping Exception Form (TKE) and submit it to "the Regional Office or facility [administrator] responsible for payroll entries."  *Id*.  Plaintiff Lewis and the Opt-in Plaintiffs reported that they usually submitted their TKEs to the FHA or AFHA at the prison facility where they worked.  Doc. [116] at 12-14.  Plaintiff Lewis and the Opt-in Plaintiffs reported high turnover in the FHA position and Plaintiff Lewis reported that the TKE approval rate was "hit or miss" and depended on the current FHA.  Doc. [115] at 21; Doc. [88-1] 61:11-14 ("they changed FHAs like crazy.  FHAs and AFHAs were gone quite a bit – a lot. Before you knew it, we'd have a new one."); *see also id.* 59:15-19; Doc [112-12] 9:23-24 ("Q. Who was the FHA?  A. Oh geez, there's so many of them.").

Plaintiff filed suit, both individually and on behalf of various subgroups of MHM workers, alleging that "MHM deducted time for meal breaks—even when these workers didn't take a break."  Doc. [106] ¶ 13.  Plaintiff states that "[a]lthough MHM claimed that employees could get another employee to cover the break or could submit a Time Keeping Exemption (TKE) sheet, in reality, the TKE process was burdensome and [Plaintiff] and the [other MHM employees] were actively discouraged or retaliated against for doing so."  *Id*. ¶ 99.  Plaintiff

3

alleges employees who did submit a TKE were "nevertheless not paid."  *Id*. ¶ 100.  Meanwhile, MHM alleges that during the life of the Arizona contract, July 2019 through September 2022, over 30,000 meal break TKEs were submitted and approved by MHM, resulting in cancelled meal deductions and payment issued for that time.  Doc. [115] at 12; Doc. [112-1] 42:11-15, 49:16-19.

On September 29, 2023, Plaintiff filed a motion for FLSA conditional certification and a motion for class certification pursuant to the Federal Rule of Civil Procedure 23.  Docs. [87], [88].  Plaintiff proposes the following FLSA collective actions:[5]

> **The Kronos Collective**:  All current or former non-exempt employees of MHM who worked in the United States at any time during payroll cycles affected by MHM's Kronos service outage, beginning on or about December 11, 2021, until the time that MHM regained full access to all Kronos products and services, and resumed normal employee timekeeping and payment operations.

> **The Meal Break Collective**:  All current or former non-exempt correctional healthcare employees of MHM who worked at a correctional facility in Arizona at any time from July 1, 2019, to September 30, 2022, were assigned a shift of 6 hours or more, and had a 30-minute meal break automatically deducted from their time.

Doc. [98] at 10.[6]  And Plaintiff proposes the following Rule 23 class actions for Arizona employees:

---

[5] The parties "agree that the FLSA Meal-Break Collective should be limited to Arizona workers at this time."  Doc. [96] at 10.

[6] The collective definitions proffered in the memorandum in support of the motion for collective certification (Doc. [98], filed October 2, 2023) differ slightly from the collective definitions provided in the Third Amended Complaint (TAC) (Doc. [106], filed October 16, 2023).  First, the TAC provides an end date of "to the present," for both collectives, while the memorandum provides end dates of "until the time that MHM regained full access to all Kronos products and services and resumed normal timekeeping and payment operations" for the Kronos Collective and "to September 30, 2022" for the Meal Break Collective.  *Compare* Doc. [98] at 10 (memorandum) *with* Doc. [106] ¶¶ 35, 36 (TAC).  Second, the memorandum provides a start date of July 1, 2019, for the Meal Break Collective, while the TAC provides a start date of February 24, 2019, for the Meal Break Collective.  Definitions from the TAC are as stated below:

> All current or former non-exempt employees of MHM who worked in the United States at any time since the onset of the Kronos ransomware attack, on or about December 11, 2021, to the present.

> All current or former non-exempt Correctional Healthcare Employees of MHM who worked at a correctional facility in Arizona at any time from February 24, 2019, to the present, were assigned a shift of at least 6 hours, and had a 30-minute meal break automatically deducted from their time.

The Court uses the definitions provided in Plaintiff's memorandum for purposes of this Order.

> **Kronos Class**:  All current or former non-exempt employees of MHM who worked in Arizona at any time during payroll cycles affected by MHM's Kronos service outage, beginning on or about December 11, 2021, until the time that MHM regained full access to all Kronos products and services, and resumed normal employee timekeeping and payment operations.

> **Meal Break Class**: All current or former non-exempt Correctional Healthcare Employees of MHM who worked at a correctional facility in Arizona at any time from July 1, 2019, to the date of judgment, were assigned a shift of 6 hours or more, and had a 30-minute meal break automatically deducted from their time.

Doc. [99] at 10.[7]  The Kronos FLSA Collective is the only class that concerns MHM employees nationwide, as the Meal Break Collective and both proffered Rule 23 classes concern only Arizona employees.

**FLSA CONDITIONAL CERTIFICATION**

Under 29 U.S.C. § 216(b), an employee may bring an action under the FLSA on her own behalf as well as for those "similarly situated."  "Plaintiffs may be similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 796 (8th Cir. 2014) (internal citation omitted), *aff'd and remanded*,

---

[7] The class definitions proffered in the memorandum in support of the motion for class certification (Doc. [99], filed October 2, 2023) also differ slightly from the class definitions provided in the TAC (Doc. [106], filed October 16, 2023).  First, the class definitions from the Third Amended Complaint provide an end date of "to the present," while the memorandum provides end dates of "until the time that MHM regained full access to all Kronos products and services and resumed normal timekeeping and payment operations" for the Kronos Class and "to September 30, 2022" for the Meal Break Class.  *Compare* Doc. [99] at 10 (memorandum) *with* Doc. [106] ¶¶ 37, 38 (TAC).  Second, the TAC defines the Kronos Class more narrowly, as employees "who worked at a correctional facility in Arizona" while the memorandum defines Kronos Class as employees "who worked in Arizona" during the relevant period.  *Id.*  Third, the TAC defines the Meal Break Class as encompassing employees who worked at MHM beginning February 24, 2019, while the memorandum defines it as only encompassing employees who worked at MHM beginning at a later date, July 1, 2019.  *Id.*  Class definitions from the TAC are as stated below:

> All current or former non-exempt employees of MHM who worked at a correctional facility in Arizona at any time since the onset of the Kronos ransomware attack, on or about December 11, 2021, to the present.

> All current or former non-exempt Correctional Healthcare Employees of MHM who worked at a correctional facility in Arizona at any time from February 24, 2019, to the present, were assigned a shift of at least 6 hours, and had a 30-minute meal break automatically deducted from their time.

The Court applies the class definitions provided in the memorandum supporting certification for purposes of this Order.

5

577 U.S. 442 (2016) (discussing only Rule 23 class certification but affirming certification of both FLSA and Rule 23 classes). "A court may consider '(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations.'" *Bouaphakeo*, 765 F.3d at 796 (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001)) (alteration in *Bouaphakeo*).

"Unlike a Rule 23 class action, a collective action under the FLSA is pursued on an opt-in basis, requiring employees to provide their consent in writing to join the action." *Johnson v. Himagine Sols., Inc.*, 2021 WL 2634669, at *3 (E.D. Mo. June 25, 2021) (quoting 29 U.S.C. 216(b) (citing *Brown v. Reddy ICE Corp.*, 2016 WL 2930933, at *1 (E.D. Mo. May 19, 2016)). The FLSA does not define "similarly situated," but "district courts generally have applied a two-step approach by which named plaintiffs first seek conditional certification to facilitate notice to the proposed class;" then later, "typically after the close of the opt-in period and discovery, the defendant may move to decertify the collective action if the record reveals that the opt-in plaintiffs are not similarly situated." *Davenport v. Charter Commc'ns., LLC*, 2017 WL 878029, at *8 (E.D. Mo. Mar. 6, 2017); *see Getchman v. Pyramid Consulting, Inc.*, 2017 WL 713034, at *4 (E.D. Mo. Feb. 23, 2017) (collecting cases applying the two-step approach); *Cupp v. MHM Health Pros., LLC*, 2024 WL 549974, at *2 (E.D. Mo. Feb. 12, 2024) (applying the two-step approach while acknowledging the Fifth Circuit and Sixth Circuit have recently rejected the approach). The burden at this stage is "not onerous" and "requires 'nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy or plan.'" *Getchman*, 2017 WL 713034, at *4 (quoting *Davis v. Navastar Mortg., Inc.*, 408 F. Supp. 2d 811, 815 (W.D. Mo. 2005)).

While "[t]his is a lenient standard, [] the plaintiff nevertheless bears the burden, and 'more than mere allegations' are required." *Tegtmeier v. PJ Iowa, L.C.*, 208 F. Supp. 3d 1012, 1019 (S.D. Iowa 2016). In other words, a plaintiff must marshal evidence, such as "detailed allegations supported by affidavits" or deposition testimony. *Benton v. Labels Direct, Inc.*, 2014 WL 4659640, at *8 (E.D. Mo. Sept. 17, 2014); *see also Littlefield v. Dealer Warranty Servs., LLC*, 679 F. Supp. 2d 1014, 1017 (E.D. Mo. 2010) (affidavits); *Haworth*, 448 F.Supp.3d at 1069 (depositions). Unsupported assertions or assertions not based on personal knowledge are insufficient to meet the "substantial allegations" standard. *Cupp*, 2024 WL 549974, at *2; *see*

6

*also Littlefield*, 679 F. Supp. at 1017 ("The plaintiffs may not meet this burden through unsupported assertions of additional plaintiffs and widespread FLSA violations.").

But the standard is somewhat higher when significant discovery has occurred.  In cases such as this one, "where the plaintiffs have been afforded discovery on the issue of whether or not the action should proceed as a collective action, courts typically apply a more restrictive, but still lenient standard, requiring the plaintiffs to demonstrate at least 'modest' factual support for the class allegations in their complaint." *Price v. Daugherty Sys., Inc.*, 2013 WL 3324364, at *3 (E.D. Mo. July 1, 2013) (citing *Pacheco v. Boar's Head Provisions Co., Inc.*, 671 F. Supp. 2d 957, 960 (W.D. Mich. 2009); *Dickerson v. Centene Mgmt. Co., LLC*, 2023 WL 6199773, at *3 (E.D. Mo. Sept. 22, 2023) (applying intermediate standard where plaintiffs have been deposed and written discovery propounded) (citing *Allen v. Pinnacle Ent., Inc.*, 2018 WL 11376058, at *4 (W.D. Mo. July 24, 2018)) (applying intermediate standard where named plaintiffs and 30(b)(6) representatives have been deposed and 20,000 pages of documents have been exchanged); *see Creely v. HCR ManorCare, Inc.*, 789 F. Supp. 2d 819, 826 (N.D. Ohio 2011) (adopting intermediate standard where three months of discovery have occurred and collecting cases); *McClean v. Health Sys., Inc.*, 2011 WL 6153091, at *4 (W.D. Mo. Dec. 12, 2011) (applying intermediate standard where 12 depositions have occurred and interrogatories have been exchanged)*; Kayser v. Sw. Bell Tel. Co.*, 912 F. Supp. 2d 803, 812 (E.D. Mo. 2012) (applying the intermediate approach adopted in *McClean* and *Creely* given the "substantial evidence" presented on summary judgment).

This "intermediate approach" requires the Court to "compare Plaintiffs' allegations set forth in their Complaint with the factual record assembled through discovery to determine whether Plaintiffs have made sufficient showing beyond their original allegations that would tend to make it more likely that a class of similarly situated employees exists." *Creely*, 789 F. Supp. 2d at 826-27.  Like the courts in *McClean* and *Allen*, this Court "cannot turn a blind eye to the amount of discovery already performed, particularly where the discovery has led to evidence which undercuts the statements made in declarations" or, as here, in discovery responses. *Allen*, 2018 WL 11376058, at *5 (citing *McClean*, 2011 WL 6153091, at *4).  Here, the parties conducted 11 months of discovery on the issue of class certification.  Plaintiffs issued 24 document requests and 10 interrogatories and MHM produced 53,051 pages of documents.  Doc. [112] ¶ 3.  MHM propounded written discovery requests to each Opt-In Plaintiff and deposed

7

Lewis and ten Opt-In Plaintiffs. *Id.* ¶ 7. Significant discovery has occurred. The Court applies an intermediate standard, requiring some factual support for Plaintiff's class allegations. *See, e.g.*, *Dickerson*, 2023 WL 6199773, at *3.

## I.        Conditional certification is denied for the proposed Meal Break Collective.

Plaintiff alleges that MHM employees worked through lunches without being paid for such time and thus have unpaid wages from time worked off-the-clock. Off-the-clock cases "typically require some proof that management imposed or knew of the off-the-clock work. Without such management participation, there is no common company policy." *Emily v. Raineri Constr., LLC*, 2015 WL 7429993, at *3 (E.D. Mo. Nov. 20, 2015). Supporting affidavits must provide detail as to managers who "knew about or facilitated the illegal overtime practices" or "who or what discouraged them from submitting overtime, or when, where, or how such instances occurred." *Settles v. Gen. Elec.*, 2013 WL 12143084, at *4 (W.D. Mo. Feb. 19, 2013). "Unsupported assertions or those not based on personal knowledge will not show that the plaintiffs are similarly situated." *Id.* at *5.

"Standing alone, an employer policy providing for automatic deductions for meal breaks does not violate the FLSA." *McClean*, 2011 WL 6153091, at *6 (citing *White v. Baptist Mem'l Health Care Corp.*, 2011 WL 1883959, at *8 (W.D. Tenn. May 17, 2011)); *Wolman v. Cath. Health Sys. of Long Island, Inc.*, 2011 WL 1741905, at *1 (E.D. N.Y. May 5, 2011) ("Defendants' default timekeeping policies are not *per se* labor law violations."); *Fengler v. Crouse Health Found., Inc.*, 595 F.Supp.2d 189, 197 (N.D.N.Y. 2009) ("The mere existence and implementation of a policy or practice of making automatic deductions for scheduled meal breaks in and of itself does not violate the FLSA.")). To state a claim under the FLSA where an employer's formal policy is to compensate employees for all time worked, Plaintiffs must also show that an employer has a "common or uniform practice . . . to not follow [their] formal, written policy." *McClean,* 2011 WL 6153091, at *6 (quoting *White,* 2011 WL 1883959, at *9) (alteration in *McClean*). In such situations, the "single, FLSA-violating policy," unifying collective members amounts to an employer's deviation from its formal, written policy. *Bouaphakeo*, 765 F.3d at 796.

Here, there is no such unifying policy. The "proof of the [FLSA-violating] policy" proffered by Plaintiff Lewis and Opt-In Plaintiffs does not "prove[] a violation as to all the plaintiffs" for two reasons. *Id.* First, Plaintiff Lewis and the Opt-in Plaintiffs have failed to put

forth adequate proof of a unifying FLSA-violating policy, even as to employees who worked at the same facility.  Rather, some employees experienced MHM's meal break policy as it is written, wherein they either took their full meal break or, upon working through a meal break, filled out a TKE form that was always approved and resulted in payment for that time.  Second, the "disparate factual and employment settings of the individual plaintiffs," *id.*, at eleven different Arizona facilities with at least eleven different decision-makers, working at least six different positions, weigh against conditional certification for Plaintiff's proffered class of all of MHM's Arizona correctional employees.  *See Bouaphakeo*, 765 F.3d at 796; Doc. [115] at 11-12.

**A.  Plaintiffs have not established a FLSA-violating policy regarding meal breaks.**

To establish an FLSA-violating policy, Plaintiff Lewis and the Opt-in Plaintiffs must show that MHM had a policy of not paying them when they worked overtime.  *See* 29 U.S.C. § 207.  In the meal break context, Plaintiff Lewis and the Opt-in Plaintiffs must show that MHM had a policy of either denying their meal break TKE forms when they worked through their meal breaks or prohibiting the use of TKE forms for meal breaks.  To start, two of the Opt-In Plaintiffs reported that they were always paid for working through their meal breaks.  Opt-In Plaintiff and Dental Assistant Maribel Bermudez reported that she was always paid for working through lunches.  Doc. [115] at 20-22; Doc. [112-2] 22:14-20 ("So . . . you never had to work through lunch and not get paid is my question? A. Yes.").  Bermudez primarily worked at the Lewis facility from July 2019 to September 2022.  Though she sometimes had to work through lunch at the Lewis facility, she was always paid for that time.  *Id.*; Doc. [112-2] 60:11-15 ("We talked about this earlier, and when you worked through lunch, you were able to submit the TKE form and get paid for that time, correct? A. Yes, sir.").  And in the time Bermudez spent working at other facilities, the Perryville and Alhambra prisons, she never had to submit a TKE because she was always able to take her lunch.  Doc. [115] at 20-21; Doc. [112-2] 42:25-44:8.

Opt-In Plaintiff and Registered Nurse (RN) Sarah Ziegler also reported that she was always paid for working through lunches.  Doc. [115] at 22; [112-12] 10:7-15 (discussing 178 cancelled meal break deductions in her deposition).  Ziegler worked at the Lewis facility for all but three weeks of the duration of MHM's contract with AZDOC.  Doc. [115] at 22.  When she was stationed at the Lewis L-11 infirmary, she could not leave for lunch because the unit needed 24-hour RN coverage, but all 178 of the TKE forms she submitted were approved.  Doc. [115] at

9

22. In contrast, when Ziegler worked at a different post within the Lewis facility, the Barchey yard, Ziegler was allowed time for lunch breaks. *Id.* She explained that she had more flexibility working at a yard, "I had a place where I could just step away from whatever I was doing because I was a yard nurse then. I didn't have to be in any place for 24 hours, you know. It was just me for the yard." Doc. [112-12] 39:7-11. Further, Ziegler stated that Lewis L-11 infirmary (also called IPC, for inpatient care) was staffed by one RN and one Certified Nursing Assistant (CNA). *Id.* 19:8-12; *id.* 20:1-17. As the RN, Ziegler had supervisory authority over the CNA, but both reported to the Director of Nursing ("DON"), who were under the AFHA and FHA. *Id.* 22:3-5; *id.* 24:4-21. Because the infirmary needed to be staffed 24 hours a day by an RN, Ziegler could not leave, but the CNA could leave to "run to lab" or "have a break." *Id.* 22:24-25:24. Specifically, Ziegler reported that she worked with CNA Mindi Steele, who complained about her TKEs getting rejected and was told "as the CNA, she could leave the unit" unlike the RN, who could not leave the unit. *Id.* 22:10-23:24.

Like Bermudez and Ziegler, Plaintiff Lewis worked at the Lewis prison facility. Doc. [115] at 20-21; Doc. [88-1] 16:15-19. This means that Plaintiff Lewis submitted her missed meal break TKE forms to the same individuals as Bermudez and Ziegler—the FHA or AFHA at the Lewis facility. Doc. [115] at 20-21. Plaintiff Lewis worked as a CNA, primarily at the Bachman yard at the Lewis facility. *Id.* Plaintiff Lewis's pay records show 25 approved TKE forms for missed lunches. *Id.* When asked what happened when MHM deviated from its policy and she did not have a TKE form approved, Lewis explained that "we would put in for [a TKE], and [MHM] would deny it a lot of times, but yet we weren't allowed to leave the facility. You had to sit in your office and eat and be ready for in case – emergencies." Doc. [88-1] 42:1-5. This suggests that Lewis would submit a TKE form for time she spent sitting in her office to be ready in case of an emergency. But the Eighth Circuit has found it "unrealistic to hold that an employer must compensate employees for all meal periods in which the employee is relieved of all duties except simply remaining on-call to respond to emergencies." *Henson v. Pulaski Cnty. Sheriff Dep't*, 6 F.3d 531, 534 (8th Cir. 1993) (FLSA action). Thus, taking Lewis at her word, it appears that she requested at least some payment for time for which she was not entitled to pay, which could explain why some of her TKE forms were denied.

Later in the deposition, Lewis stated "while we're eating, we're also working. So we would tell them where we worked through lunch, and they're like, we're not paying you" Doc.

10

[88-1] 59:9-12.  When asked why she felt compelled to eat while she was working, Lewis replied "[b]ecause you have to be available for the [emergencies]." *Id.* 94:10-13.  As Lewis explained, she always worked through lunch, either doing "paperwork," *id.* 60:4-7, "doing my charting, doing lab work, pulling up—getting ready for the next patient," *id.* 82:21-24, or because "somebody would bring in an inmate for us to see," which she said happened at least once a week, *id.* 99:8-100:9.  Lewis testified that the TKE approval process was "hit-or-miss," that some FHAs and AFHAs were agreeable, while others were not as agreeable—every FHA or AFHA handled the TKE approval differently.  Doc. [115] at 21; Doc. [88-1] 60:17-61:20; 135:1-5.  Further, the FHA position experienced a lot of turnover.  Doc. [88-1] 61:11-14 ("they changed FHAs like crazy.).  Although all nursing staff in the various yards at the Lewis facility turned their TKEs into the same person, Lewis said she didn't know why some employees had more than 170 TKEs approved but she only had 25 approved.  *Id.* 62:7 – 63:1; Doc. [115] at 21.  Lewis reported that no one told her not to fill out a TKE for a missed meal break but admitted that she didn't always fill out a TKE when she missed a meal break.  *Id.* 63:2-7, 96:2-97:2; Doc. [115] at 21.

Other Opt-In Plaintiffs also reported mixed experiences with the meal break system at the Lewis facility.  For example, Opt-in Plaintiff Mindi Steele reported problems with the meal break policy and didn't remember being paid for 158 cancelled meal break deductions noted on her timekeeping exceptions report.  Steele worked as a nursing assistant at the Lewis facility L11 infirmary from July 2019 to December 2021.  Doc. [115] at 23; Doc. [112-10] 9:11-10:6.  Steele testified in her deposition that she understood the process for filling out TKE forms for missed lunches, but only "sometimes" submitted them because "they'd get denied or they would just stop using them altogether."  Doc. [115] at 23; Doc. [112-10] 37:3-17.  She said that some supervisors approved more TKEs than others, but she couldn't remember any names.  Doc. [115] at 23; Doc. [112-10] 13:9-20.  Though Steele did not recall receiving them, her time sheet revealed that she received 158 cancelled meal break deductions.  Doc. [115] at 23; Doc. [112-10] 42:6-43:7.  Receiving 158 meal deductions over the roughly two and a half years that Steele worked at the Lewis facility works out to an average of more than one cancelled meal deduction per week.

Similarly, Opt-In Plaintiff Betty Grayson had varied experiences with meal breaks.  From July 2019 to September 2022, Grayson worked as a CNA on the Lewis facility night shift on the

same unit where Ziegler and Steele worked the day shift. Doc. [115] at 24. During orientation, Grayson was told to use the TKE forms to make time corrections, including for meal breaks, and to submit them to her supervisor. *Id.* As shown in her timekeeping exception report, Grayson's lunch deduction was cancelled 177 times from September 29, 2019, to June 1, 2020, nearly every day she worked. *Id.;* Doc. [112-18] at 4-16. Sometime in 2020, Grayson was told "not to submit TKE papers no more for our lunch break. No matter what we had to find time to take our lunch." Doc. [112-6] 66:12-17, *id.* 64:16-65:4. After June 1, 2020, Grayson received no meal break deduction cancellations. Doc. [115] at 24; Doc. [112-18] at 16-37. But Grayson testified that she had trouble finding time to take her lunch "because there's a lot of times you can't leave the office because we are there in the center of the inmates and if they are dying, you have to be there. If they are hitting a call light, you have to answer it. It's just like being at a hospital." Doc. [112-6] 65:18-23. In short, Grayson was paid for working through her meal break almost every day she worked from September 29, 2019 to June 1, 2020, but was never paid a meal break deduction cancellation after June 1, 2020. Grayson said she didn't know how lunch breaks were handled in other units, *id.* 67:14-16, by people working on the day shift, *id.* 68:4-6, or her coworkers, *id.* 62:1-4 ("I never paid any attention of what anybody else paperwork was"); *id.* 66:22-67:1 ("like I said, I didn't pay attention to what forms they were filling out.").

Even within the Lewis facility, employees had widely varying experiences regarding the ability to cancel auto-deductions for meal breaks by filing a TKE. Bermudez and Ziegler were always paid for working through meal breaks, while Lewis and Steele only sometimes were. Doc. [115] at 21-22. In contrast, Grayson was seemingly always paid for working through meal breaks, until June 1, 2020, then not after that, though other employees at the Lewis facility were paid for working through meal breaks after June 1, 2020. *Id*. at 24. Grayson's experience with the meal break policy appears idiosyncratic. MHM points out three other Opt-In Plaintiffs who worked at the Lewis facility and received meal break deductions until September 2022. Docs. [115] at 24; [112-19] at 26 (Michele Lombardo received last of 189 cancelled deductions on Sept. 17, 2022); [112-16] at 23 (Kendra Jensen received last cancelled deduction on Aug. 10, 2022); [112-20] at 22 (Jessica Knight received last cancelled deduction on Feb. 24, 2022); [112] at 6 (Lombardo, Jensen, and Knight worked at the Lewis facility). Each employee's experience was different.

In a recent case in this district, plaintiffs similarly alleged that an employer failed to pay employees for all overtime worked. *Dickerson*, 2023 WL 6199773, at *4. Because the "[p]laintiffs' motion fail[ed] to substantiate allegations that the putative class members were together victims of a single decision, policy or plan," the court denied conditional certification under the FLSA. *Id.* (citing *Hampton v. Maxwell Trailers & Pick-Up Accessories, Inc.*, 2020 WL 1888798, at *1 (E.D. Mo. Apr. 16, 2020)). "Plaintiffs' bare assertions that Defendant engaged in an employee-wide policy of forbidding overtime pay is insufficient to constitute evidence that Defendant engaged in violating the FLSA." *Id.* (citing *Peck v. Mercy Health*, 2022 WL 17961184, at *1–7 (E.D. Mo. Dec. 27, 2022);  ; *Evans v. Cont. Callers, Inc.*, 2012 WL 234653, at *5 (E.D. Mo. Jan. 25, 2012)). Similarly here, Plaintiff has failed to substantiate allegations that even the Opt-In Plaintiffs were victims of a single FLSA-violating policy.

Though the auto-deduction policy applied to all putative collective members, as discussed, the auto-deduction policy itself does not violate the FLSA. *See, e.g.*, *McClean*, 2011 WL 6153091, at *6. The FLSA-violating policy Plaintiff must prove is that MHM refused to pay employees when their time spent working through meal breaks meant they worked unpaid overtime. *Id.*; 29 U.S.C. § 207(2)(C) (FLSA mandates paying all time and a half for hours worked over 40 hours a week). But proof of "conduct in conformity with that policy" does not "prove[] a violation as to all the plaintiffs," as required to show that the Opt-In Plaintiffs are similarly situated. *Bouaphakeo*, 765 F.3d at 796. Plaintiff Lewis complains that MHM wrongfully denied some of her meal break TKEs. Even crediting Lewis's testimony, it does not prove a violation as to all members of the putative collective. For instance, Opt-In Plaintiffs Bermudez and Ziegler did not experience the issues Plaintiff Lewis alleges. Further, testimony from Ziegler and Plaintiff Lewis herself cast doubt on whether some of the putative collective were truly owed payment for time for which they submitted TKEs—whether they were legally "working" or simply on call. Inquiring into the facts surrounding each of the putative class members' meal breaks over from July 1, 2019 to September 30, 2022, Doc. [98] at 10, is procedurally unwieldy and unsuited to collective treatment. *Bouaphakeo*, 765 F.3d at 796 (fairness and procedural considerations).

Plaintiff has failed to demonstrate that MHM had a uniform policy of making employees work through lunch then denying payment for such time. Between Plaintiff and Opt-in Plaintiffs, ten of the 11 received cancelled meal break deductions, and six of the 11 received

between 46 and 178 cancelled deductions.  Doc. [115] at 28.  As deposition testimony revealed, whether an individual worked through lunch or could get payment for doing so hinged on her job title (*e.g.*, RN, CNA, dental assistant), job site (*e.g.*, yard or infirmary), facility worked (*e.g.*, Lewis prison or Pima prison), shift worked (*e.g.*, day or night shift), and the identities of her supervisors, FHA, and AFHA.  *See, e.g.*, Doc. [115] at 20-22.

### B.  Disparate circumstances of the putative members also preclude conditional certification.

Even if MHM's meal break policy was shown to be a FLSA-violating policy, Plaintiff has not shown sufficient factual similarity within the putative collective to warrant conditional certification.  MHM employed workers at 11 prison complexes in Arizona, each headed up by a different FHA.  Doc. [115] at 11-12.  As relevant here, the handling of TKE forms varied by facility and according to the FHA or AFHA managing the facility at a given time.  Doc. [115] at 11-12.  As Plaintiff Lewis explained, some FHAs and AFHAs were "more agreeable" to granting meal break TKEs, and turnover was high in the FHA position.  Doc. [115]; Doc. [88-1] 60:17-61:20; *id.* 61:11-14 ("they changed FHAs like crazy.); *id.* 135:1-5.  Plaintiff seeks to conditionally certify a collective of all "[a]ll current or former non-exempt correctional healthcare employees of MHM who worked at a correctional facility in Arizona at any time from July 1, 2019, to September 30, 2022, were assigned a shift of 6 hours or more, and had a 30-minute meal break automatically deducted from their time."  Doc. [99] at 10.  Because MHM employed 1,995 non-exempt Arizona employees during that time period, the Meal Break Collective includes up to 1,995 employees.  Doc. [88-6] at 2, 10-11.

Plaintiff Lewis and 20 of the Opt-In Plaintiffs worked at the Lewis facility, five other class-eligible Opt-In Plaintiffs worked at the Yuma facility,[8] opt-in Plaintiff Edmons worked at the Eyman facility, and opt-in Plaintiff Bermudez worked mostly at Lewis, with some work time at the Perryville and Alhambra facilities.  Doc. [115] at 11-12; Doc. [112] at 6.  In other words, Plaintiff and the Opt-in Plaintiffs worked primarily at three of the 11 MHM-staffed prison facilities in Arizona:  Lewis, Yuma, and Eyman.  MHM employed 246 employees at the Lewis facility, 170 at Yuma, and 298 at Eyman.  Doc. [88-6] at 10-11.  Plaintiff proffers virtually no

---

[8] Two Opt-In Plaintiffs who worked at the Yuma facility, Danielle Briden and Diana Curd, were exempt employees during the relevant period and thus ineligible to recover under the FLSA for unpaid overtime wages.  Doc. [112] at 6.

evidence regarding the other eight facilities:  Douglas, Florence, Perryville, Phoenix (Alhambra), Pima, Safford, Tucson, and Winslow.  This could be surmountable if Plaintiff demonstrated a uniform FLSA-violating policy across the Arizona prison facilities, but Plaintiff did not do so.  In fact, Plaintiff does not discuss any similarities or differences in meal break policies among the Arizona prison facilities but merely mentions in passing that MHM employed workers at 11 Arizona facilities and that individual supervisors signed off on TKE forms.  Doc. [98] at 10, 11.

The cherry-picked evidence that Plaintiff submits is insufficient to establish that the members of the putative collective are similarly situated.  First, Plaintiff neglected to mention the deposition testimony from any of the ten deposed Opt-In Plaintiffs.  As discussed above, the Opt-In Plaintiffs put forth contradictory testimony regarding MHM's application of its meal break policy.  Instead, Plaintiff attached interrogatory responses only for ***six non-deposed Opt-In Plaintiffs***, all of whom worked at the Lewis facility.  Doc. [87-3]; Doc. [115] at 26.  As discussed above, Opt-In Plaintiffs Bermudez, Ziegler, Grayson, and Steele testified to mixed experiences with meal breaks at the Lewis facility, even contradicting each other.  Plaintiff neglects to address this.  Despite acknowledging that TKE approval depended on supervisory sign-off, Plaintiff did not discuss similarities or differences in whether supervisors' approved meal break TKEs.

With her motion for conditional certification, Plaintiff attached an exhibit labeled Plaintiffs' Discovery Responses featuring the following boilerplate interrogatory responses from five non-deposed Opt-In Plaintiffs:

> In addition to this time, MHM automatically deducted a 30-minute meal break every day that we worked over 6 hours. MHM deducted this time despite the fact that it knew that we could not and did not actually get an uninterrupted meal break
> . . .
> Every employee who worked for MHM at a correctional facility in Arizona worked off-the-clock because they did not get paid for all the time they spent working, including deducted meal breaks which they did not receive ….
>
> Every employee who worked for MHM at a correctional facility who was automatically deducted time when they worked 6 hours a day but who worked through lunches was also working off-the-clock because lunches were automatically deducted even when we regularly worked through them.
>
> I know this from my own experience and from talking to and observing my coworkers.

Doc. [87-3] at 4 (Erica Shepherd); 10 (Jamie Pemberton); 16 (Jose Maldonado); 22 (Laura Wagnor); 28 (Sandra Solis).  Other evidence from the Opt-In Plaintiffs casts doubt on these interrogatory responses.  In fact, Plaintiff provided identical interrogatory responses for all Opt-In Plaintiffs, even those who contradicted the interrogatory responses in their depositions.  For instance, Plaintiff provided identical responses for those same interrogatories for Opt-In Plaintiff Maribel Bermudez, who reported that she was *always* able to submit a TKE form and get paid for time she spent working through meal breaks.  *See* Doc. [112-14] at 5 ("Every employee who was automatically deducted time . . . [for] lunches was also working off-the-clock"); *compare to* Doc. [112-2] 60:3-15 (Q. . . . when you worked through lunch, you were able to submit the TKE form and get paid for that time, correct? A: Yes, sir.").

Additionally, Plaintiff provided identical responses for those same interrogatories for Opt-In Plaintiff Betty Grayson, who did not report any knowledge about any other employee's timekeeping or pay.  *See* Doc. [112-24] at 12 ("Every employee . . . was also working off-the clock . . . I know this from my own experience and from talking to and observing my coworkers"); *compare to* Doc. [112-6] 67:14-16 (Grayson didn't know how lunch breaks were handled in other units); *id.* 68:4-6 (or by people working on the day shift); *id.* 62:1-4 ("I never paid any attention of what anybody else's paperwork was"); *id.* 66:22-67:1 ("like I said, I didn't pay any attention to what forms they were filling out.").  None of the Opt-In Plaintiffs claimed knowledge about the pay and meal break practices experienced by "every employee," despite the fact that interrogatory responses for each stated otherwise.  *See* Doc. [115] at 25-28; n.110 (citing testimony from Opt-In Plaintiffs Lombardo, Ziegler, Bermudez, Edmons, Steele, Grayson, Knight, Taylor, Jensen, and Whiting); Doc. [112-24] at 12 ("Every employee . . . was also working off-the clock . . . I know this from my own experience and from talking to and observing my coworkers").  Opt-In Plaintiffs reported in their depositions that they knew nothing about practice and procedure at either other facilities, different units, others in the same role, or others on different shifts.  *Id.*

In response to the interrogatory instructing plaintiffs to identify any claim or complaint submitted to MHM or any government agency about MHM, employment with MHM, or pay or hours worked, the six Opt-In Plaintiffs stated the following in their interrogatories attached to the motion for conditional certification:

- "Regarding our meal-break and off-the-clock time, I complained to the DON [Director of Nursing] about not being paid for security screening time, but nothing was done.  I also complained to the DON about working through lunch, and the DON said she would look into it, but nothing was done."  Doc. [87-3] at 5 (Erica Shepherd).

- "Regarding our meal-break and off-the-clock time, I complained about working through lunches to senior directors, nursing directors.  I was told to toughen up because there was no coverage."  Doc. [87-3] at 11 (Jamie Pemberton).

- "Regarding our meal-break and off-the-clock time, I complained at a meeting about working through lunches.  The supervisors said they would look into it, but nothing changed.  That was when we contacted the DOL."  Doc. [87-3] at 17 (Jose Maldonado).

- "Regarding our meal-break and off-the-clock time, I complained about working through lunches, but nothing was done."  Doc. [87-3] at 22 (Laura Wagnor).

- "Regarding our meal-break and off-the-clock time, I complained about working through lunches to the DON and ADON all the time.  They said that they know, but there was no choice because we were short-staffed."  Doc. [87-3] at 28 (Sandra Solis).

The Court again emphasizes the distinction between working through lunch and getting paid for it—which, while presumably unpleasant, does not violate the FLSA—with working through lunch and not getting paid for it, which violates the FLSA if it means that employees are working overtime hours for which they are never paid.  In the interrogatory responses quoted above, the Opt-In Plaintiffs complain only about working through lunches, not any refusal to pay them for doing so.  Though "off-the-clock time" in the interrogatory responses may refer to time spent working through lunch for which an employer requests and is ultimately denied payment, it may also refer to time spent going through security screenings (a claim which has since been dismissed) or to time spent working through lunch, following which an employee neglects to submit a TKE.  Plaintiff bears the burden of establishing that Plaintiff, the Opt-In Plaintiffs, and the putative collective are "similarly situated" under the FLSA, and she has failed to do so.

In her memorandum supporting conditional certification, Plaintiff proffers evidence from Opt-In Plaintiffs about only the Lewis facility.  Doc. [115] at 8, 26.  Regarding the other Arizona facilities, Plaintiff cites only a DOL Compliance Report acknowledging some issues with the meal break policy and also that some employees had "no issues" with meal breaks.  Doc. [34-1] at 10.  The DOL investigation occurred from July 1, 2019, to October 15, 2020.  The DOL Report states, in relevant part:

First violation resulted when employer failed to reimburse employees when not taking a 30 minute meal break.  Employer's policy is to automatically deducted [sic] 30-minute meal breaks from the company time keeping system, per shift, when employee works at

17

least a 6 hour shift, at all prison locations . . . .  There are multiple reasons this violation occurred to include:  To take a meal break many employees must find another employee to cover their duty position.  Employee interviews stated that due to the lack of available staff or the inability of any other staff member qualified to perform their duties.  Many employees did not have the ability to take a meal break.  Additionally, employees who were not able to take a meal break stated that they would submit time keeping exemption (TKE) sheets, however, ***the 30 minute meal breaks would never be reimbursed.*** Employees also stated that management looked down negatively at employees who used a TKE sheet, resulting in many employees choosing not to use sheets.  Others stated that the nearest break room was a significant distance from duty station and employee would have to spend a majority of their break time walking to and from the break room.  Others stated that they simply did not feel like submitting a TKE sheet.  (Exhibits B-1-1,4,6-9,12,15,16,18,20,22-26, B-2-2, B-3-1-2, B-4-3, B-5-2b B-6-2,3).

. . .

Hourly paid employees (meal break)-Overtime was computed by determining the average number of uncompensated hours per week for 30 minute unpaid meal breaks.  First, interviews were conducted of employees for all prison locations.  The higher the number of employees per prison the more interviews conducted. Each employee (full time or part time who work more than 40 hours per week) interviewed was asked several questions to include, "On the average how many times are you not able to take a meal break and not compensated per week?"  Answers varied between 0 and 5.  An average number of times per week was then determined based on each prison facility.  The average number of times a meal break was uncompensated was then multiplied by 30 minutes to determine the ***number of uncompensated minutes per week.  Average number of minutes varied between 0 and 1.33***.  See exhibit A-2. Avg Times Centurion.xlsx for averages.  *Please note that employees who stated "no issues" were not included in the backwage computations.*

Doc. [34-1] at 9-10 (last emphasis original).  The DOL Report thus describes a unified, FLSA-violating policy, but not one supported by the factual record in this case.  In particular, the Report claims that after employees submitted TKEs for working through lunch, "the 30 minute meal breaks would never be reimbursed."  Doc. [34-1] at 9.  But that is not borne out by the record.  Opt-In Plaintiffs Ziegler and Bermudez were always paid for the TKEs they submitted, and all but one Opt-In Plaintiff had meal breaks reimbursed.  Doc. [115] at 28.  Even if the term "never" is used hyperbolically in place of "almost never," the record does not support that reading either.  Among the 11 former MHM employees who were deposed, six had between 46 and 178 cancelled meal break deductions, meaning that more than half of the sampled employees were paid for a significant number of meal breaks.  *Id.*

Additionally, the Report found that the average number of uncompensated minutes per employee per week "varied between 0 and 1.33" at each prison facility.  Doc. [34-1] at 10.  Even at the high end of that range—1.33 uncompensated minutes per week—the vast majority of

18

employees and/or the vast majority of meal breaks are paid correctly at that facility.  Further, the fact that some prison facilities had an average of *zero* uncompensated minutes per week suggests that any problem with MHM's meal break policy is limited to certain prison facilities, rather than common to all Arizona facilities.  It is possible that there is a class of MHM correctional employees in Arizona who are similarly situated as to suffering FLSA violations resulting from the meal break policy, but Plaintiff has not established that its collective as currently defined is similarly situated for purposes of the meal break policy.  *See* Doc. [98] at 10 (defining Meal Break Collective as "[a]ll current or former non-exempt correctional healthcare employees of MHM who worked at a correctional facility in Arizona").  Plaintiff's best evidence regarding most of the Arizona facilities (because in her memorandum, Plaintiff only proffered testimony regarding the Lewis facility, not the ten others), shows that *some of the Arizona facilities had no problems* with meal breaks.  These are not "substantial allegations that the putative class members were together the victims of a single decision, policy or plan."  *Getchman*, 2017 WL 713034, at *4 (quoting *Davis*, 408 F. Supp. at 815 (W.D. Mo. 2005)).  Rather, the record suggests that some putative collective members experienced the meal break policy exactly as written, with employees paid for all time worked if they submit a TKE form, and other putative collective members experienced a different version of the meal break policy, under which time spent working through meal breaks was not reimbursed.  Because the putative collective did not suffer from a "single, FLSA-violating policy," they are not similarly situated.  *Bouaphakeo*, 765 F.3d at 796.  Collective certification is improper here.

### C. Plaintiff's case law is unpersuasive because Plaintiff fails to support her claims that employees were discouraged from submitting TKEs.

Plaintiff's cited cases fail to support conditional certification in this action.  In *Brashear*, *Quay*, and *Peck*, plaintiffs succeeded on conditional certification by providing specific allegations from multiple opt-in plaintiffs that they were discouraged from requesting payment for their automatically-deducted meal breaks, or otherwise unable to do so.  *Brashear v. SSM Health Care Corp.*, 2023 WL 4247601 (E.D. Mo. June 29, 2023); *Peck v. Mercy Health*, 2022 WL 17961184, at *5; *Quay v. Monarch Healthcare Mgmt. LLC*, 2023 WL 4947459 (D. Minn. Aug. 3, 2023).  Here, Plaintiff has provided no allegation from any Plaintiff that he or she was discouraged from submitting a TKE, instead relying on a DOL Report which asserts "[e]mployees also stated that management looked down negatively at employees who used a

19

TKE sheet" Doc. [34-1] at 5, 9 (reporting on investigation conducted from July 1, 2019 to Oct. 15, 2020).  But Plaintiff neglects to marshal evidence of such discouragement through assertions based on personal knowledge.  *See Littlefield*, 679 F. Supp. at 1017 ("The plaintiffs may not meet this burden through unsupported assertions of additional plaintiffs and widespread FLSA violations."); *Evans*, 2012 WL 234653, at *5 (plaintiff's bare assertion is insufficient to constitute evidence that employer engaged in systematic policy of violating the FLSA regarding mealtime deductions such to warrant conditional certification).  In fact, Plaintiff Lewis testified in her deposition that she was never told not to fill out a TKE.  *See* Doc. [112-4] 96:23-97:2 ("Did anyone ever tell you, Ms. Lewis, do not submit a TKE? . . . A. No, they never said do not fill one out."); *see also id.* 63:2-7 (explaining that she would not always fill out a TKE form because they were normally denied).

Plaintiff cites *Brashear*, *Peck*, and *Quay* as examples of cases in which the respective court granted conditional certification upon a sufficient showing that employees were discouraged from requesting payment for meal breaks that they worked through.  *Brashear*, 2023 WL 4247601, at *2; *Peck*, 2022 WL 17961184, at *5;  *Quay*, 2023 WL 4947459.  In *Brashear*, the court notes that "[t]he declarants describe essentially identical treatment in terms of how SSM managed their required meal breaks, including allegations that supervisors discouraged employees from filing 'no-meal break reports.'" 2023 WL 4247601, at *2.  For example, an opt-in plaintiff reported in her declaration that "[management] told me and my coworkers that hourly employees will be written up or given verbal warning if they report a no meal break." *Brashear v. SSM Health Care Corp.*, No. 4:22-cv-00569, Doc. [53-2] ¶ 14 (E.D. Mo. Sept. 30, 2022).

Meanwhile in *Peck*, plaintiffs were also unable to request payment for meal breaks they worked through, either because the procedure was not publicized or because of outright discouragement.  One plaintiff reported that she was unaware as to how to cancel her meal break deduction, even after she complained to her manager, while another was aware of the function to cancel her meal break deduction, but states that she was instructed by her supervisors not to use it.  *See Peck*, 2022 WL 17961184, at *4 (citing specific statements from multiple opt-in plaintiffs' declaration as reported in plaintiff's memorandum).  Finally, in *Quay*, opt-in plaintiffs filed declarations with specific allegations about how they were discouraged from requesting payment for meal breaks they worked through.  2023 WL 4947459, at *1.  For instance, one plaintiff stated in her declaration that "[The Director of Nursing] told me that if any employee

fills out three or more no-meal break reports they would be written up"). *Quay v. Monarch Healthcare Mgmt. LLC*, No. 21-1796, Doc. [51-8] (D. Minn. Sept. 15, 2022).  Another plaintiff in *Quay* reported that he or she did not know about the process for requesting such payment, and while another still asserted that supervisors regularly denied requests for compensation for meal breaks because they claimed that the requester could not prove that they did not take a break. 2023 WL 4947459, at *1.

Here, unlike those cases, Plaintiff provides generic interrogatory responses from various putative plaintiffs that, even if true, do not allege sufficient facts for conditional certification.  In the proffered interrogatory responses, Plaintiff Lewis and the Opt-In Plaintiffs allege only that the auto-deduction policy exists for meal breaks, which by itself is not a problem.  *See McClean*, 2011 WL 6153091, at *6 ("Standing alone, an employer policy providing for automatic deductions for meal breaks does not violate the FLSA."); Doc. [88-3] at 4 ("Every employee who worked for MHM at a correctional facility . . . who worked through lunches was also working off-the clock because lunches were automatically deducted even when we regularly worked through them.").  As explained, MHM employees had the option to submit a TKE form to request payment for their lunch period.  A FLSA violation occurs where employees are deprived of pay for time spent working—such as where submitting a TKE or its equivalent is discouraged, impossible, or such payment is refused.  *See* 29 U.S.C. § 207(2)(C) (prohibiting work over 40 hours per week unless such employee receives overtime compensation); *Emily*, 2015 WL 7429993, at *3 (off-the-clock cases "typically require some proof that management imposed or knew of off-the-clock work.").

"Plaintiffs' bare assertions that Defendant engaged in an employee-wide policy . . . [are] insufficient to constitute evidence" for FLSA conditional certification.  *Dickerson v. Centene Mgmt. Co., LLC*, 2023 WL 6199773, at *4 (E.D. Mo. Sept. 22, 2023) (denying plaintiff's motion for collective certification) (*citing Evans*, 2012 WL 234653, at *5).  In *Dickerson*, the court denied conditional FLSA certification, citing declarations proffered by plaintiff that "present[ed] vague and nonspecific claims regarding the nonpayment of overtime."  *Dickerson*, 2023 WL 6199773, at *4. As the court explained, "[n]either Plaintiff set[] forth any specific times they and the other Care Coordinators were not paid overtime, any specific other Care Coordinators with whom they spoke, [or] how it was made known that they and other Care Coordinators were required to work overtime without receiving overtime pay."  *Id.*  Similarly here, Plaintiff has not

21

pointed to any specific time she or other Opt-In Plaintiffs were denied payment for overtime they were compelled to work.  As in *Dickerson*, "Plaintiff['s] bare assertions that Defendant engaged in an employee-wide policy of forbidding overtime pay is insufficient to constitute evidence that Defendant engaged in violating the FLSA."  *Id.* (citing *Peck*, 2022 WL 17961184, at *1-7; *Evans*, 2012 WL 234653, at *5).

## II.        <u>Conditional certification is granted as to the Kronos Collective.</u>

In contrast, Plaintiff has established that the Kronos Collective suffered from a "single FLSA-violating policy" warranting conditional certification.  *Bouaphakeo*, 765 F.3d at 796.  All MHM's non-exempt employees were subject to the same time, pay, and accounting practices adopted in response to the Kronos outage.  Doc. [98] at 14.  MHM used the Kronos system for recording time worked and calculating pay.  Doc. [102] ¶¶ 16, 19.  When a ransomware attack rendered the Kronos system inoperable from about Dec. 11, 2021, to mid-February 2022, MHM adopted a uniform policy for estimating wages due.  Doc. [98] at 12-13.  MHM replicated employees' prior pay periods, making select adjustments for some pay periods.  *Id.* at 12-14.  As a result of this policy, some employees were underpaid and others were overpaid.  MHM performed a reconciliation process in February 2022, seeking to correct the over and under-payments.  *Id.* at 13.  Plaintiff alleges that MHM's reconciliation process was improper under the FLSA because it "netted" employee pay across the entire outage period, rather than correcting wages owed for each pay period individually.  *Id.* at 14.  Plaintiff tells a cohesive story of MHM's company-wide treatment of non-exempt employees during and following the Kronos outage.  In support, Plaintiff cites 30(b)(6) deposition testimony and MHM's company-wide messaging regarding employee wages during the Kronos outage.  *Id.* at 12; Doc. [87-5] 74:9-12 ("Q. And you wanted to make sure that , in terms of handling the outage, that it was handled consistently with respect to all of Centurion's employees, correct? A. Correct.").

Although MHM contests the deficiency of its policy, it does not spill much ink in its memorandum to contest the universality of its response to the Kronos outage.  Rather, MHM requests only that the Court (1) defer ruling on conditional certification for the Kronos Collective until after addressing its pending Motion for Partial Summary Judgment on the Kronos Claims and (2) limit notice to only the relevant pay periods if it grants conditional certification.  *See* Docs. [101]; [104]; [115] at 7, 13, 30.  Further, other courts have certified company-wide collectives for employers that took a similar approach to MHM in response to the Kronos outage.

*See, e.g.*, *Gaul v. Accura Health Ventures, LLC*, 651 F. Supp. 3d 1054 (S.D. Iowa Jan. 18, 2023) (conditionally certifying collective of all non-exempt workers at all company facilities using Kronos time and pay systems); *Thornton v. Tyson Foods, Inc.*, 683 F. Supp. 3d 885 (W.D. Ark. July 24, 2023) ("It is undisputed that Tyson's policy to duplicate the December 4 pay period for the December 11 pay period was a uniform, companywide policy, as were the company's policies to manually track hours during the remainder of the hack and reconcile pay on a 'net' basis, rather than pay period by pay period.").[9] And similar company-wide timekeeping and payroll practices have historically been collectively certified. *See, e.g.*, *Zivali v. AT&T Mobility LLC*, 646 F.Supp.2d 658, 662 (S.D.N.Y. 2009).

The parties agree that MHM treated all non-exempt employees similarly during the Kronos period and that MHM's actions aligned with its announced policy. And here, "proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs," *Bouaphakeo*, 765 F.3d at 796, so conditional certification is appropriate for the Kronos Collective. Plaintiff has put forth "substantial allegations that the putative class members were together the victims of a single decision, policy or plan" to estimate employee wages during the Kronos outage and to "net" wages across pay periods in its reconciliation process. *Getchman*, 2017 WL 713034, at *4 (quoting *Davis*, 408 F. Supp. 2d at 815). The Court conditionally certifies the Kronos Collective as defined below:

> **The Kronos Collective**: All current or former non-exempt employees of MHM who worked in the United States at any time during payroll cycles affected by MHM's Kronos service outage, beginning on or about December 11, 2021, until the time that MHM regained full access to all Kronos products and services, and resumed normal employee timekeeping and payment operations.

Doc. [98] at 10. Later, after the close of the opt-in period and discovery, the MHM "may move to decertify the collective action if the record reveals that the opt-in plaintiffs are not similarly situated." *Davenport*, 2017 WL 878029, at *8; *see Getchman*, 2017 WL 713034, at *4; *Cupp*, 2024 WL 549974, at *2.

---

[9] *See also Albert v. Honda Dev. & Mfg. of Am., LLC*, 752 F. Supp. 3d 869, 880 (S.D. Ohio 2024) ("[T]he "common theory is that Honda violated the FLSA during the Kronos outage by not paying, or not timely paying, overtime compensation due to nonexempt employees. . . . [and] Honda applied blanket rectification efforts across the board."); *Coulter v. Villa Healthcare Mgmt., Inc.*, 2024 WL 3352631, at *2 (N.D. Ill. July 9, 2024), *reconsideration denied*, Doc. [91], (N.D. Ill. Oct. 8, 2024) (certifying collective, relying upon "evidence suggesting that in the wake of the Kronos outage, [employees'] wages would be calculated and paid pursuant to a centralized and standardized process").

In her reply, Plaintiff Lewis requests that if the Court "takes up MHM's motion for summary judgment before Plaintiffs' motion for FLSA conditional certification, it should (at minimum) simultaneously toll statute of limitations to prevent erosion of the putative collective's statues of limitations while the motion is pending." Doc. [125] at 4-5. In MHM's opposition to conditional FLSA certification, it first raised the issue of equitable tolling by requesting that "[a]ny request for equitable tolling should be made by separate motion after the Court addresses the sequence of motions so MHM has a full and fair opportunity to address any such argument." Doc. [115] at 13 n.27. The Court agrees with MHM's proposed approach and instructs Plaintiff to make any request for equitable tolling by separate motion following this Order. Plaintiff may submit such motion no later than April 30, 2026, and Defendant may submit a response no later than May 28, 2026.

### III.     Equitable tolling must be considered before the notice terms may be ordered.

The Supreme Court acknowledged that, in order for employees to take advantage of the benefits of an FLSA collective action, they must receive "accurate and timely notice" regarding the pending collective action. *Hoffmann-LaRoche*, 493 U.S. 165, 170 (1989). Courts routinely require an employer to produce names, dates of employment, and last known home addresses, email addresses, and phone numbers of Putative Collective Members to facilitate notice. *Fulton v. Bayou Well Svcs. LLC*, 208 F. Supp. 3d 798, 803 (N.D. Tex. 2016); *see Hoffmann- LaRoche*, 493 U.S. 165, 170 ("The District Court was correct to permit discovery of the names and addresses . . . "). Though an FLSA notice is authorized by the Court, it represents a communication from the Plaintiff and Plaintiff's counsel to other prospective class members. *King v. ITT Cont'l Baking Co.*, 1986 WL 2628, at *3 (N.D. Ill. Feb. 13, 1986).

Crucially, absent equitable tolling, no MHM employees who have not yet opted in are eligible to join the class, mooting the issue of notice. Under the FLSA, an action is barred unless it is filed within two years of the date on which the cause of action accrued, or three years if the violation was willful. *Dixon v. Edward D. Jones & Co., L.P.*, 2022 WL 4245423, at *6 (E.D. Mo. Sept. 15, 2022) (citing 29 U.S.C. § 255(a)). For FLSA actions, the statute of limitations runs for all putative plaintiffs until they elect to join the suit or file their own action. *Id.*; citing *Fair v. Commc'ns Unlimited, Inc.*, 2019 WL 4695942, at *2 (E.D. Mo. Sept. 26, 2019). At the latest, the Kronos Collective claims' accrued in February 2022, when MHM made reconciliation payments. Doc. [99] at 13. Because four years have passed since the claims accrued, any claim

24

by an MHM employee who has not yet opted in to the lawsuit is time-barred.  Therefore, no notice would be required to facilitate such opting in.  Plaintiff initiated the lawsuit by filing her Complaint on February 24, 2022, Doc. [1], and filed her Memorandum in Support of its Motion for Conditional Certification on October 2, 2023, Doc. [98].  Though "equitable tolling is a rare and infrequent form of relief applied only in exceptional circumstances," its consideration is warranted here.  *Dixon*, 2022 WL 4245423, at *5 (E.D. Mo. Sept. 15, 2022).[10]

### RULE 23 CLASS CERTIFICATION

Class certification is governed by Federal Rule of Civil Procedure 23.  "Rule 23 does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Instead, a plaintiff "must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Id.* (emphasis in original).  Rule 23 requires a plaintiff to satisfy all four prerequisites of Rule 23(a) and at least one of the provisions of Rule 23(b).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  "The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims."  *Dukes*, 564 U.S. at 349 (quoting *Swales v. KLLM Transp. Servs., LLC.*, 985 F.3d 430, 433 (5th Cir. 2021) (internal quotation marks omitted)).

### I.     Rule 23 Factors

#### A.  Numerosity 23(a)(1)

Rule 23(a)(1) requires "the class be so numerous that joinder of all members is impracticable."  "[A] plaintiff does not need to demonstrate the exact number of class members as long as a conclusion is apparent from good faith estimates."  *Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099, 1140 (W.D. Mo. 2020).  Although the Eighth Circuit has not established strict requirements regarding the size of a proposed class, *see Paxton v. Union Nat. Bank*, 688 F.2d 552, 559 (8th Cir. 1982), class sizes as small as 20 have been held to satisfy the numerosity requirement.  *Ark. Educ. Ass'n v. Bd. of Educ.*, 446 F.2d 763, 765 (8th Cir. 1971).  Here, the Meal Break Class contains 1,995 employees and the Kronos Class contains 771 employees.

---

[10] *See, e.g.*, *Penley v. NPC Int'l, Inc.*, 206 F. Supp. 3d 1341, 1351 (W.D. Tenn. 2016) (two-year delay in ruling on conditional certification is exceptional circumstance warranting equitable tolling).

Doc. [88-6] at 2; Doc. [99] at 10. Thus, the proposed classes easily meet the numerosity requirement.

### B.  Commonality 23(a)(2)

A class meets the commonality prerequisite when "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). And those common questions of law or fact must "predominate over any questions affecting only individual members." FED. R. CIV. P. 23(b)(3). "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013). "Commonality is not required on every question raised in a class action," *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995). The Court must "begin by considering the nature of the plaintiffs' claim to determine whether it is suitable for class certification." *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1033 (8th Cir. 2020) (citation omitted).

### C.  Typicality 23(a)(3)

The third requirement for class certification under Rule 23(a) is that "the claims . . . of the representative parties" be "typical of the claims . . . of the class." FED. R. CIV. P. 23(a)(3). In assessing typicality, courts consider whether the named plaintiff's claim "arises from the same event or course of conduct as the class claims and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp. United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996). The requirement "is fairly easily met so long as other class members have claims similar to the named plaintiff." *DeBoer*, 64 F.3d at 1174.

### D.  Adequacy 23(a)(4)

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). "The focus of Rule 23(a)(4) is whether:  (1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Lopez*, 2008 WL 3485289, at *18 (quoting *Paxton*, 688 F.2d at 562). This requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (citation omitted).

### E. Predominance 23(b)(3)

In addition to the Rule 23(a) requirements, a plaintiff must also show the action may be maintained under Rule 23(b)(1), (2), or (3) prior to certification. *Amchem*, 521 U.S. at 614. Plaintiff seeks to certify the class under Rule 23(b)(3), which requires: "questions of law or fact common to class members predominate over any questions affecting only individual members, and [that] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### II. Class certification for the Meal Break Class is denied for the same reasons that FLSA conditional certification is denied for the Meal Break Collective.

Because collective actions under the FLSA are governed by different standards than class actions under Federal Rule of Civil Procedure 23, *see Houston v. Saint Luke's Health Sys., Inc.*, 76 F.4th 1145, 1148 n.1 (8th Cir. 2023), the Court addresses Defendant's challenges to the collective and class claims separately.  .  Courts recognize that FLSA conditional certification sets out a "much lower bar" than Rule 23 class certification. *Dennis v. Greatland Home Health Servs., Inc.*, 591 F. Supp. 3d 320, 330 (N.D. Ill. 2022) (quoting *Lukas v. Advoc. Health Care Network & Subsidiaries*, 2015 WL 5006019, at *8 (N.D. Ill. Aug. 19, 2015)); *see also Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 520 (2d Cir. 2020)) ("[T]he FLSA not only imposes a lower bar than Rule 23, it imposes a bar lower in some sense than Rules 20 and 42 . . . ."). Thus, it is no surprise that class certification is denied on the meal break claims.  Recently, the Supreme Court applied this logic to decline to analyze FLSA conditional certification, assuming without deciding that because it determined that Rule 23 class certification was proper, that FLSA conditional certification was proper, too. *See Bouaphakeo*, 577 U.S. at 452 ("The parties do not dispute that the standard for certifying a collective action under the FLSA is no more stringent than the standard for certifying a class [action] . . . [so] if certification of respondents' class action under the Federal Rules was proper, certification of the collective action was proper as well.").  The opposite logic applies here: because Plaintiff has not met the standard for conditional certification, it would be extremely unlikely for Plaintiff to have met the rigorous standard for Rule 23 class certification.[11]  Nonetheless, the Court conducts a quick Rule 23 analysis.

---

[11] Though the Rule 23 analysis implicates the AWA rather than the FLSA, both statutes relate to unpaid wages and the proposed classes are both premised on allegedly unpaid work during meal breaks.

Plaintiff seeks to certify a Rule 23(b)(3) class, which means she must satisfy the four Rule 23(a) requirements and establish that common questions "predominate over any questions affecting only individual members," and that class resolution is 'superior to other available methods for fair and efficient adjudication of the controversy." *Amchem*, 521 U.S. at 615; Doc. [99] at 25. This inquiry "asks whether the common, aggregation-enabling issues in the case are more prevalent or important than that non-common, aggregation-defeating, individual issues." *Orduno v. Pietrzak*, 932 F.3d 710, 716 (8th Cir. 2019) (quoting *Bouaphakeo*, 577 U.S. at 453-54). Defendant challenges the predominance of the proposed class, arguing that Plaintiff failed to establish that the meal break policy is applied unlawfully throughout the class of all non-exempt Arizona correctional employees. Doc. [116] at 26-27. Although the auto-deduct policy is common to class members, the auto-deduct policy is not an unlawful practice—the unlawful practice occurs when an employee's supervisor, FHA, or AHFA denies or discourages his or her efforts to seek payment for time spent working through lunch. *Id.*

"At the core of Rule 23(b)(3)'s predominance requirement is the issue of whether the defendant's liability to all plaintiffs may be established with common evidence." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010) (citing *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)). "A claim is not appropriate for class treatment where it requires individualized, fact intensive inquiry into facts and circumstances unique to each putative class member." *Henke v. Arco Midcon, L.L.C.*, 2014 WL 982777, at *14 (E.D. Mo. Mar. 12, 2014) (citing *Blades*, 400 F.3d at 569-72). Here, some putative plaintiffs had no issue with the meal break policy. Some may have had TKEs denied because they did not really work through lunch. Determining what happened when a TKE was denied requires an individualized, fact-intensive inquiry into the circumstances unique to each putative class member, making class certification inappropriate. Individual questions, such as whether an employee truly worked through lunch or was merely on standby, whether an employee filled out a TKE form, or whether it was possible for him or her to take a meal break, predominate over the common questions.

Plaintiff cites *Cruz v. TMI Hospital, Inc.*, to support certification of the meal break class, but that case is readily distinguishable. 2015 WL 6671334, at *8 (D. Minn. Oct. 30, 2015). In *Cruz*, the plaintiffs certified a class of employees who worked off the clock in connection with auto-deduction meal break claims, but there, "all of the proposed class members held the same job (housekeepers), worked at the same location (the Fairfield in Bloomington), and were

28

supervised by the same person (Ms. Ochoa)." 2015 WL 6671334, at *8.  Thus, the court reasoned, the class satisfied the commonality requirement.  In contrast, here, the proposed class members hold at least six job titles (RN, CNA, LPN, dental assistant, pharmacy technician, medical records clerk) and staff different posts (*e.g.*, at Lewis facility alone, one of eight prison yards or infirmary) at eleven prison facilities (Lewis, Douglas, Eyman, Florence, Lewis, Perryville, Phoenix (Alhambra), Safford, Tucson, Winslow, Yuma, and Pima) on at least two different shifts.  *See* Doc. [115] at 11-12, 21; Doc. [34-1] at 10.  Because the evidence shows that employees' experiences differed within and among prison facilities according to job title and post assignment, the claims are not appropriate for class treatment.  *See, e.g.*, Doc. [115] at 20, 22; Doc. [112-12] 39:7-11; 22:10-23:24; 38:22-39:11(Lewis RN Ziegler explaining that she could take meal breaks at a prison yard post, but rarely could at the infirmary, though she was always paid for such work, and stating that CNAs could take meal breaks more easily than RNs).  Plaintiff has not shown that the smattering of missed meal breaks was due to a common scheme.  Rather, the issues unique to each plaintiff predominate over the issues that unite the class, making class certification inappropriate for the proposed Meal Break Class.

**III.    Class Certification is granted for the Kronos Class.**

Plaintiff's proposed Kronos Class satisfies all four Rule 23(a) requirements along with Rule 23(b)(3) predominance, making certification proper.

**A.  Numerosity 23(a)(1)**

First, the proposed class is large enough to warrant class treatment.  Defendant does not contest this.  The Kronos class contains up to 771 non-exempt MHM employees who worked in Arizona during the Kronos outage period, beginning on or about December 11, 2021, until the time that MHM regained full access to all Kronos products and services, and resumed normal timekeeping and payment operations.  Doc. [88-6] at 2; Doc. [99] at 10.

**B.  Commonality 23(a)(2) and Predominance 23(b)(3)**

Because of the overlap between Rule 23(a)'s commonality requirement and Rule 23(b)(3)'s predominance requirement, the Court addresses them together.  "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 376 (8th Cir. 2013) (quoting *Dukes*, 564 U.S. at 349-350).  Similarly, the predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 377 (quoting *Amchem*,

521 U.S. at 623).  The predominance inquiry is more demanding in that, "'[w]hen determining whether common questions predominate, a court must conduct a limited preliminary inquiry, looking behind the pleadings, but that inquiry should be limited to determining whether, if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class.'"  *Id.* (quoting *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011)).  Common issues may predominate even if "other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."  *Bouaphakeo*, 577 U.S. at 454 (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, 123-124 (3d ed. 2005)) (footnotes omitted); *see also Day v. Celadon Trucking Servs., Inc.*, 827 F. 3d 817, 833 (8th Cir. 2016).

Defendant argues that individual questions, such as those regarding damages, predominate over common questions, preventing certification of the class.  Doc. [116] at 26-27.  Though it is true that some employees were underpaid and others were overpaid during the Kronos outage, "[w]hat matters to class certification . . .  [is] the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Dukes*, 564 U.S. at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)) (emphasis original).  This "means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Fritz v. Corizon Health, Inc.*, 2021 WL 3883643, at *3 (W.D. Mo. Aug. 30, 2021) (citing *Dukes*, 564 U.S. at 350).  Here, the common answer Plaintiff seeks is whether MHM violated the AWA by estimating employee pay during the Kronos outage and/or by netting payments for its reconciliation process, such that it owes damages to the class.  That issue predominates over individual questions of damages.  *See, e.g.*, *Amgen*, 568 U.S. at 459 ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."); *DeBoer*, 64 F.3d at 1174 ("The fact that individuals . . . [have] claims of differing strengths does not impact on the commonality of the class as structured.").

The Eighth Circuit in *Bouaphakeo* dispelled any misconception that class certification is inappropriate if some class members won't receive damages, specifically rejecting Tyson's argument to the contrary.  765 F.3d at 797 ("Tyson exaggerates the authority for its

30

contention.").[12]  In that case, the court certified a class of Tyson employees who spent unpaid time putting on and taking off required protective gear, explaining that "while individual plaintiffs varied in their donning and doffing routines, their complaint is not 'dominated by individual issues' such that the 'varied circumstances . . . prevent one stroke determination."  765 F.3d at 797 (quoting *Dukes*, 564 U.S. at 349).

Another way to understand the predominance inquiry is that it requires "some glue holding the alleged reasons for [the] decisions together."  *Dukes*, 564 U.S. at 351.  In *Dukes*, pay and promotion decisions were mostly committed to local supervisors' discretion, *id.* at 343, with no proof of a companywide discriminatory policy, *id.* at 357.  Because of this, the Court explained that the plaintiffs could not show that "all the employees' Title VII claims will in fact depend on the answers to common questions."  *Id.* at 356.  Put differently, "the only corporate policy that the plaintiffs' evidence convincingly establishes is Wal–Mart's 'policy' of *allowing discretion* by local supervisors over employment matters."  *Id.* at 355 (emphasis original).   The meal break class failed the certification requirements for this reason, too:  individual decisionmakers may have denied TKEs for meal breaks for a multitude of reasons, even though MHM's corporate policy was to enable cancellation of auto-deductions through TKE forms when an employee worked through their meal break.  *See* Doc. [99] at 10-11; Doc. [116] at 13.

In contrast, here, MHM decided to handle employee pay during the outage the same way for all non-exempt employees: replicating prior pay periods to estimate proper pay.  Doc. [99] at 12-14.  MHM made this decision with respect to all employees for the same reason—it couldn't access the Kronos database during the ransomware attach and found it impossible to calculate wages.  *Id.*; Doc. [116] at 10.  Though individual plaintiffs vary in whether they were underpaid or overpaid, and by how much, see Docs. [88-6] at 2, [102-18] at 2-3, the dominant issue is whether MHM violated the AWA and thus owes them compensation.

---

[12] Though the Supreme Court affirmed the Eighth Circuit's decision, it declined to opine on the specific issue at hand because Tyson abandoned its argument that a class may not be certified with undamaged members. *Bouaphakeo*, 577 U.S. at 460 ("In its petition for certiorari petitioner framed its second question presented as whether a class may be certified if it contains 'members who were not injured and have no legal right to any damages.'  In its merits brief, however, petitioner reframes its argument.  It now concedes that '[t]he fact that federal courts lack authority to compensate persons who cannot prove injury does not mean that a class action (or collective action) can never be certified in the absence of proof that all class members were injured.'  In light of petitioner's abandonment of its argument from the petition, the Court need not, and does not, address it." (internal citations omitted).

Finally, a class action here "is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).  The factors to consider in determining superiority include: (1) class members' interests in pursuing individual actions; (2) any existing individual litigation; (3) judicial efficiency; and (4) the "likely difficulties in managing a class action."  FED. R. CIV. P. 23(B)(3)(A)-(D); *Douglas Phillip Brust, D.C., P.C. v. Opensided MRI of St. Louis LLC*, 343 F.R.D. 581, 594 (E.D. Mo. 2023).  Here, the class members have little incentive to sue, as their individual damages may be meager depending on the amount of their over or underpayment; adjudication of 771 individual claims would be inconvenient and cost judicial resources, and any manageability concerns are outweighed by the superior nature of a class action for resolving this case.  *See* Doc. [88-6] at 2.  Non-exempt MHM employees in Arizona may seek efficient and uniform resolution of their claims with this class action.  *See Amchem*, 521 U.S. at 615.

### C.  Typicality 23(a)(3)

Because Plaintiff Lewis's claim "arises from the same event or course of conduct as the class claims and gives rise to the same legal or remedial theory," *Alpern, Inc.*, 84 F.3d at 1540, typicality is satisfied for the proposed class.  Defendant mentions typicality only in a footnote appended to its argument challenging Lewis's adequacy as class representative for inconsistencies in testimony regarding the Meal Break Class, for which certification is denied. Doc. [116] at 21 n.93.  Because Defendant does not contest typicality as to the Kronos Class, the Court moves on to the other Rule 23 requirements.

### D.  Adequacy 23(a)(4) and Appointment of Class Counsel 23(g)

Defendant challenges whether Plaintiff Lewis may 'fairly and adequately' protect the interests of the class.  FED. R. CIV. P. 23(a)(4)).  "In making this determination, the Court must consider '(1) whether the representatives and their attorneys are able and willing to prosecute the action completely and vigorously, and (2) whether each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge.'" *Douglas*, 343 F.R.D. at 592 (quoting *Moore v. The Boeing Co.*, 2004 WL 3202777, at \*13 (E.D. Mo. Mar. 31, 2004)

Defendant argues that Plaintiff Lewis's false interrogatory responses render her an inadequate class representative.  Doc. [116] at 20.  In particular, Defendant points to Plaintiff Lewis's interrogatory response claiming to know "from my own experience, from talking to and

observing my co-workers, and from reviewing the DOL's investigation records," that "[e]very employee" worked off-the-clock at each Arizona facility because they did not get paid for meal breaks they worked through." Doc. [116] at 21.  At her deposition, Plaintiff Lewis described her knowledge regarding other employees' experience with meal breaks as much more limited.  *Id.* at 22-23.  As Defendant quotes, "it is self-evident that a Court must be concerned with the integrity of individuals it designates as representatives for a large class of plaintiffs."  *In re Computer Memories Sec. Litig.*, 111 F.R.D. 675, 682 (N.D. Cal. 1986)

Defendant also notes similar inconsistencies between Opt-In Plaintiffs' "identical sworn interrogatories obviously drafted by Plaintiffs' counsel" and those Plaintiffs' deposition testimony.  Doc. [116] at 24.  Under Rule 23(a)(4), "[t]he same fiduciary obligations apply as well to counsel seeking to represent the class.  Where there is reason to doubt counsel's ability to meet those duties, class certification must be denied."  *Wagner v. Lehman Bros. Kuhn Loeb Inc.*, 646 F. Supp. 643, 661 (N.D. Ill. 1986) (citations omitted).  Plaintiff responds that Defendant has cherry-picked the record to mislead the Court.  Doc. [126] at 10.

Though Defendant raises valid concerns about the integrity of Plaintiff's Counsel and to a lesser extent, Plaintiff herself, those concerns do not preclude Plaintiff's counsel from acting as class counsel and Plaintiff from acting as class representative.  "For an assault on the class representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims."  *Fritz*, 2021 WL 3883643, at *5 (quoting *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 728 (7th Cir. 2011)).  *Wagner v. Lehman Brothers*, which Defendant cites in support of its argument to bar class certification and appointment of Plaintiff's counsel as class counsel, involves far more egregious facts than this case.  646 F. Supp. at 661.  Plaintiff in that case promised to pay a witness up to 20% of his total recovery in exchange for the witness's testimony, which Wagner's attorney knew about and permitted, in violation of multiple ethical rules.  *Id.*  Exaggerating knowledge of others' injuries does not rise to that level.

Under Rule 23(g), a court certifying a class action must appoint class counsel.  In appointing counsel, the Court must find counsel will "fairly and adequately represent the interests of the class."  FED. R. CIV. P. 23(g)(1)(B).  The Court "must consider (i) the work counsel has done in identifying or investigating potential claims in the action, (ii) counsel's

experience in handling class actions, other complex litigation, and the types of claims asserted in the action, (iii) counsel's knowledge of the applicable law, and (iv) the resources that counsel will commit to representing the class." FED. R. CIV. P. 23(g)(1)(A).  The Court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." FED. R. CIV. P. 23(g)(1)(B).

Plaintiff's counsel have proven themselves qualified to handle the class action.  They have invested significant time and effort in pursuing this action and have significant experience serving as class counsel in other collective actions.  *See* Docs. [88-8] ¶ 9, [88-9] ¶ 10, [88-10] ¶ 17.  Accordingly, Morgan & Morgan P.A. and Parmet PC are designated as Co-Class Counsel.

CONCLUSION

**IT IS HEREBY ORDERED** that the Motion to Certify Class Pursuant to the Fair Labor Standards Act, Doc. [87], is **GRANTED** as to the Kronos Collective and **DENIED** as to the Meal Break Collective and Security Collective.

**IT IS FURTHER ORDERED** that Plaintiff may submit a motion requesting equitable tolling of the FLSA claims no later than April 30, 2026, and Defendant may submit a response no later than May 28, 2026.  No reply will be considered.

**IT IS FINALLY ORDERED** that the Motion to Certify Class Pursuant to Federal Rule of Civil Procedure 23, Doc. [88], is **GRANTED** as to the Kronos Collective and **DENIED** as to the Meal Break Collective and Security Collective.

Dated this 31st day of March, 2026.

SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE

34